RECEIVED
DEC 29 2022
RICHARD W. NAGEL, CLERK OF COURT
COLUMBUS, OHIO

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KEVIN A. TOLLIVER (428576)**
2500 South Avon-Belden Road
Grafton, Ohio 44044

        PLAINTIFF,

        V.

**OHIO DEPARTMENT OF REHABILITATION
AND CORRECTIONS**
ANNETTE CHAMBERS-SMITH (DIRECTOR)
4545 Fisher Road, Suite D
Columbus, Ohio 43228

        DEFENDANT(S).

Case No.: 2:22 CV 4567

Judge: JUDGE SARGUS

Magistrate: MAGISTRATE JUDGE JOLSON

*Counsel for Defendants:*
Dave Yost Attorney General
Corrections Litigation Division
150 East Spring Street
Columbus, Ohio 43215

*Plaintiff in Pro Se:*
Kevin A. Tolliver (428576)
Grafton Correctional Institute
2500 South Avon-Belden Road
Grafton, Ohio 44044

---

## DECLARATORY JUDGMENT

---

### I. Introduction

1.     This is an original action in Declaratory Judgement field by Kevin A. Tolliver, a state prisoner, seeking, declaratory judgment and injunctive relief under 42 USC 1983. This petition originates upon Defendant's violations of the Plaintiff's First Amendment rights under the United States Constitution in regard to freedom of religion and violations of protections against establishment of religion. It includes issues for determination under The Religious Land Use and Institutionalized Persons Act (RLUIPA), among others.

1

## II. Jurisdiction

2. The U.S. District Court has jurisdiction pursuant to 42 U.S.C. 1983. The foundation of this action is a violation of Kevin A. Tolliver's First Amendment rights and violations of RLUIPA.

3. The court also has jurisdiction over the Plaintiff's claims of violations of federal constitutional rights under 42 U.S.C. 1331 and 1343 as federal questions jurisdiction and federal equity jurisdiction to enforce the dictates of the 1st Amendment. This action seeks to redress deprivations, under color of state law secured by Congress and the U.S. Constitution.

## III. Parties

4. Plaintiff: Kevin A. Tolliver (A428576), an inmate in a state custody, currently incarcerated at Grafton Correctional Institute (GCI), 2500 South Avon-Belden Road, Grafton, Ohio 44044.

5. Defendants: The Ohio Department of Rehabilitation and Corrections (ODRC), Annette Chambers-Smith (Director), 4545 Fisher Road, Columbus, Suite D, Ohio 43228. Standing in her official capacities for the fiction ODRC as signatory and/or administrators over the ODRC Policies for the purposes of Declaratory Judgments and Injunctive Relief.

6. Sued in their: official capacities for declaratory judgments, injunctive relief, and "appropriate relief" for the constitutional violations and RLUIPA claims.

## IV. Exhaustion of Administrative Remedy

7. Plaintiff exhausted administrative remedies for relevant grievances. However, Plaintiffs' complaint is a direct challenge to practices and policies of the Ohio Department of Rehabilitation and Correction. This action relates to Declaratory Judgments raised but not addressed by this court within collateral complaint *Tolliver v. Noble* (Case No. 2:16 – cv – 1020).

## V. Procedural Posture

8.  Over the last two decades the ODRC has established a system of contracting independent Islamic Services Providers as institutional Imams at all Ohio prisons. The policies and practices used are constitutionally unfair and violate RLUIPA.

9.  The ODRC has found that employment of a particular set of contractors from the WD Muhammad (WDM) sects, and other underqualified candidates, keep the number of Muslims using religious services down and thus creates more opportunities to safeguard resources for Christian Inmates and programming.

10. Defendants discriminate against hiring qualified candidates from mainstream Islamic communities and dismiss, or force-out, contractors who attempt to provide services proportionally on par with those provided to Christian Inmates.

11. Instead, ODRC is often awarding individual underqualified candidates; multiple contracts, at several different prisons across Ohio in an unserviceable manner. These practices have damaged the value of said contracts, made them untenable to would be applicants, and harmed the Muslim Inmate recipients.

12. This denial of the Muslim Inmates' basic religious rights statewide amounts to an establishment of religion in favor of Christianity and/or the WDM group. Mainstream Sunni Islam is the single largest unitary group of worshipers in many Ohio prisons. Usually only second when various Christians groups are combined (e.g. Putting Protestant groups together).

13. Employing these specific contracting methods over the years allows ODRC, its Administrators and Staff to benefit in other ways as well. These contractors are almost exclusively laypeople who commonly lack ability, knowledge or willingness to implement rights, rituals, and or obligations. Hence, the ODRC blames every issue and problem of an inmate's complaint on a Contractor who by design is unqualified.

14. Examples of this are: the Tradition of Lamb Meat on the Eid al-Adha, which used to be budgeted for, but not ordered nor served at WDM contractor facilities.; Coordination of Islamic prayer during Ramadan, which has been denied (delayed past its required time) upon opinions given by WDM Contractors (i.e.: inmates were forced to choose between eating the "Iftar" evening meal or praying "Magrib" evening prayer).; The requirements of recitation of the "Kutba al-Hijr" in Arbic at the beginning of every Jummuah.;

The failure to order, or even accept donations of books, to support the proper education and spiritual development when those books do not support a Contractor's minority views.; Among many other issues.

15. One reason for denials of these rights, services, and for ODRC's ability to operate in this unconstitutional manner, is ODRC Policies 72-REG-01 through 12 are ineffective as they apply to Islam.

16. As it pertains to this suit in the areas of: 1) Not distinguishing between religious differences of Islamic groups; 2.) Failing to define critical terms. 3.) Not outlining intrinsic rights and rituals.

17. In this light, the Policy itself violates the Religious Land Use Institutionalized Persons Act (RLUIPA) and/or creates conditions favorable to abuse by contractors, administrators, and staff.

18. Furthermore, by having no Muslim employees anywhere in the Religious Services Departments of ODRC, qualified by advanced education in Islamic studies (M.A. or Ph.D.) or similar religious accreditations (A'lim, Mufti, or Shaykh), there is no one on staff to properly oversee hiring of contractors and/or to administer and supervise policy issues on behalf of one of ODRC's principal faith group.

19. As it has been managed and implemented by Defendants, these issues constitute religious persecution, denial or infringement of religious rights, and an establishment of religion in favor of both Christianity and the WDM style of practice, which is an ongoing harm to Plaintiff and all similarly situated mainstream adherents to the Islamic faith in Ohio prisons.

20. The Policies, Contracts, Contractors, as well as the screening for qualifications, ability & fitness are inadequate in Ohio prison's and therefore causing on going harm to Plaintiff and all similarly situated mainstream normative adherents to the Islamic faith

21. Non-Muslim staff, who cannot speak Arabic, are unfamiliar with the rights and rituals of Jummuah prayer, fasting Ramadan, or the necessities of a proper Taleem class, are hiring Islamic Service Providers to ensure these obligations are available to Muslim Inmates. This is being done by ODRC employees having no knowledge or ability to assess the actual qualifications of the candidate for Institutional Imam.

22. Additionally, ODRC uses a tactic of granting an unmanageable number of contracts to these laypeople as a ploy to deny services at most Ohio prisons. One contractor cannot be at multiple facilities at the time for Jummuah prayer on Friday afternoon. Thus, many prisons only get Jummuah once a month.

## VI. Request for Declaratory Judgment and Injunctive Relief

23. Plaintiff Kevin A. Tolliver hereby requests declaratory and injunctive relief against Defendant Ohio Department of Rehabilitation and Correction. Plaintiff alleges as follows:

**1.) Classification of all denominations (groups or sects) of the Islamic faith under one policy without recognition of major differences in the rites and rituals thereof results in an ineffective policy that denies religious services to Muslim Inmates.**

    **a. The terms "largest religious catchment" and "broadest range of adherents" in 72-REG-12 must mean mainstream Sunni practice or is too vague to accommodate normative Sunni Muslims. Because Sunni orthodoxy alone serves all major Islamic communities.**

24. Defendant's failure to define the terms "largest catchment" and "broadest range" in policy on the Islamic faith has resulted in their failure to provide services to the mainstream Muslim Inmates on par with those provided to other faith groups (i.e.: Christians).

25. Muslims are not one homogeneous group. Although most groups recognize the methods and practice of the Orthodox Sunni school of thought as authentic, acceptable, and mainstream, many of the smaller sectarian divisions, have their own ways that would not be adequate nor tolerable to someone from a conventional Sunni community. (See: Exhibit -1: ODRC Policy)

26. Sunni Muslims make up 90% of the world's 1.9 Billion Muslims or 22% of the total population of earth. Mostly comprised of 1.) The Four Madhabs (schools of jurisprudence) Hanafi, Maliki, Shafi, and Hambali; and 2.) Salafi Minhaj. Together, these two groups are referred to as "Ahl-Sunnah wal-Jammah" and are universally recognized as mainstream or orthodox Islam.

27. After which there are many smaller groups who are sometimes Sunni in practice while having unorthodox beliefs; or vise-versa they might consider themselves Sunni in belief while having practices unacceptable to the mainstream or orthodox Muslim community (i.e.: There are significant denominational and/or sectarian differences).

5

28. If ODRC employs Islamic services contractors not conforming to the beliefs and/or practices of the normative Muslim orthodoxy, as is alleged in this complaint, inmates from the largest portion of the religion will likely not have their needs met. This is not to infer the hire is not a "Muslim" per se, nor to challenge their personal beliefs, only that in performance of their duties as a religious services provider they must conform to "mainstream" rites and rituals which make the service valid for the normative Muslim denomination (i.e.: Orthodox Sunni Muslims).

29. The ODRC has separate policies for Catholics, Protestants, Jehovah's witnesses and other Christian denominations. It is not appropriate that ODRC refuses to give this same respect and treatment to the Islamic faith groups.

### b. Shia Muslims have significant religious differences to Sunni Muslims and thus deserve their own policy or subsection.

30. Shia (a.k.a. Shi'ites or Shia'Ali) have very similar practice to Sunni's and will generally, with some internal sectarian opposition, consider Sunni services valid. However, they have doctrinal differences and acts of worship that must be noted and respected under policy. Typically, Sunni's would not consider Shia variant beliefs or services valid.

### c. The nation of Islam (NOI) is a group with little in common with mainstream Sunni Muslims and thus deserve their own policy or subsection.

31. The Nation of Islam (NOI) is a black nationalist sect founded by Elijah Poole (aka: Elijah Muhammad) and he is their prophet. The NOI shares nothing more than terminology with mainstream Islamic communities. They generally do not hold to any of the primary doctrines of the Sunni's. Specifically, they reject: An Omnipotent non-corporeal God in heaven, finality of Prophet hood, uncreated perfection and inalterability of the Qur'an, Hadith sciences, life after death, heaven and hell being physical places, among other core beliefs.

6

32. NOI theology is structured around the idea that the "Black Man" is the original man. That he is god and master of his own universe and he created the white race who are all devils. All concepts offensive to ordinary Sunni Muslims. NOI members reject Sunni services as "spookism" because the NOI does not believe in the concept of A Creator God without corporeality. They typically do not participate in mainstream Sunni services except as social gatherings. Sunni's do not consider NOI variant beliefs or services valid. Sunni Muslims, when aware of the NOI's divergent beliefs, find their participation in Jummuah (Friday Prayer) disrespectful and consider it a "braking of the ranks" (i.e.: A gap in prayer line which needs to be closed).

### d. The Moorish Science Temple of America (MST) is a group with little in common with mainstream Sunni Muslims and thus deserve their own policy or subsection.

33. The Moorish Science Temple of America (MST) are a black nationalist sect which, like NOI, shares nothing more than terminology with mainstream Islamic communities. Even there, like the NOI, they assign vastly different meanings to the vocabulary. They have their own prophet named Drew Ali and their own religious book they call the Koran, but it has no similarity to the Qur'an of the Sunni and Shia Muslims. Sunni Muslims, when aware of the MST's divergent beliefs, find their participation in Jummuah (Friday Prayer) disrespectful and consider it a "braking of the ranks" (i.e.: a gap in prayer line which needs to be closed).

### e. The Nation of Gods and Earths (5%'s) are not a religion recognized by ODRC and should not be considered under the policy for Islam.

34. The 5% nation has its roots in the NOI and hold that 5% of Blacks are endowed with perfect knowledge. 15% of people know this and conceal it from the public. Like the NOI they hold the "Black Man" is god. Sunni Muslims, when aware of the 5%'s divergent beliefs, find their participation in Jummuah (Friday Prayer) disrespectful and consider it a "braking of the ranks" (i.e.: a gap in prayer line which needs to be closed).

**2.) As its written 72-REG-01, 02 and 12 lack sufficient detail for establishment of what "Jummuah Services" are and what rites and rituals must be observed to make it valid for mainstream Muslims.**

35. Because ODRC has failed to outline what rites and rituals must be observed for the Jummah services and ODRC has been contracting with members of non-traditional communities, a contractor is free to do as he pleases. This results in the denial of Jummuah at many institutions habitually (See: Exhibit – 2: Jummuah Rights and Rituals).

36. This is done with the intention of keeping mainstream Muslim participation in religious services low. The objective being to conserve religious budgets and resources for Christian Inmates and Christian programming.

37. Because the Defendants have no Muslim staff in the Religious Services Department at Central Office, nor in the Regional Catchment Areas, nor at any of its 36 prisons, there is no one to supervise or administer these types of situation on behalf of the incarcerated Islamic community.

**3.) Failure to contract Islamic Services Providers from mainstream communities, and/or to have criteria in place to ensure contractors are able, willing, and qualified to perform rites and rituals necessary to perform their duties results in a denial of services to Muslim Inmates from conventional communities.**

38. ODRC has insufficient criteria to determine if a contractor for Islamic services is qualified, willing, and able to perform the services for which they are contracted. This results in denial of Jummuah and taleem at multiple institutions on thousands of occasions. Because ODRC has no Muslim staff anywhere in the Religious Services Department statewide (properly credentialed and qualified by education or otherwise) there is no one to address this problem in hiring contractors.

**4.) Issuing multiple contracts to one Islamic Services Provider at several different ODRC facilities denies services to Muslim Inmates around Ohio.**

39. One ODRC contractor for Islamic services may commonly hold from 3 to 7 contracts at various prisons around the state simultaneously. He is expected to provide Jummuah services on Fridays at each. Because Jummuah occurs during a relatively small window on Friday afternoon, it is unreasonable to expect one man can be at multiple facilities at the same time.

40. This results in a denial of Jummuah services on Fridays at those facilities where the contractor does not attend. Furthermore, because there is a contract in place it prevents Muslim Inmates from self-performance under supervision if other staff (e.g.: Chaplain or DWSS) as is standard under policy when there is no contract. Therefore, these contracts are being used by ODRC staff to prevent Jummuah services.

**5.) Failure to employ any properly educated/credentialed Imams as staff members anywhere within the Religious Services Department of ODRC (i.e.: Central Office, Regional Catchment Areas, nor any of the 36 Ohio prisons):**

- **a.) Prevents contracting quality Islamic Services Providers from mainstream communities at the individual prisons;**
- **b.) Precludes a criteria ensuring services contracted for conform to rites and rituals of normative practice throughout the State; and,**
- **c.) Results in a denial of services to Muslim Inmates from conventional communities.**

41. Because ODRC has no Muslim staff in the Religious Services Department at Central Office, nor in the Regional Catchment Areas, nor at any of its 36 prisons, there is no one to supervise or administer these situations on behalf of the incarcerated Islamic community.

42. At each ODRC institution it is the Protestant Chaplain and the Deputy Warden of Special Services (DWSS) who are responsible for contracting the prison's Islamic Services Provider

(Imam). At most, if not all facilities, this entirely Christian religious services staff allege it is impossibly hard to find able, willing and qualified Islamic Service Providers.

43. These non-Muslim ODRC employees lack competence to make informed decision within a specialized field effecting the rights of thousands of incarcerated Muslims. Additionally, they are motivated by religious self-interest not to hire candidates who would compete for resources, currently allocated to Christian Inmates and programming, on a fair and proportional basis.

44. An Islamic Services Provider candidate's application is processed through central office for an approval consisting of little more than a check for a tax I.D. # and proof the person is qualified to officiate a wedding. Neither of these two criteria have any bearing on a candidate's ability to perform the duties of Islamic Services Provider.

45. This approval process does not establish or confirm the candidate's ability to perform the rites and rituals of a "mainstream" Jummuah service, lead prayer in a manner acceptable to normative practitioners [i.e.: recite the Qur'an in Arabic without errors and to have extensive knowledge of the rules applicable to prayer and especially congregational Jummuah.].

46. Correspondingly, that the candidate has sufficient knowledge of the Muslim inmate's obligations in Ramadan, the mainstream rites, rituals, and beliefs to instruct a taleem class, or that he is otherwise qualified to give spiritual counsel in times of hardship (e.g.: death of a child).

47. According to 72-REG-01 (C) (3) contractors "should appeal to the broadest range of adherents in the faith group" and "should emphasize the common, fundamental teachings of the faith." Unfortunately, there is no evidence that the entirely Christian staffed Religious Service office of ODRC has a clear understanding of this requirement, or that they are adept at determining the qualifications of a candidate.

48. It appears the primary consultants for ODRC have been Sunni Ali Islam and Ibrahim Abdul Karim. Both are from a minority group founded by W.D. Muhammad (WDM School). W.D. Muhammad is the son of Elijah Poole (founder of the NOI) and many of this group's members shares various problematic views held by the NOI. Specifically, Mr. Ali is a contractor who has been dismissed multiple times from several prisons, and has entire populations of Muslim Inmates who refuse to attend his services due to his non-conformance to mainstream Islam.

49. This staffing failure results in denials of religious services including: Jummuah, taleem, and other important religious obligations. Lack of a properly educated Islamic specialist anywhere on ODRC's staff prevents consistent treatment of inmates and quality assurance at facilities.

50. Because ODRC has no properly credentialed Imam (Islamic priest), qualified by education, on its staff anywhere in the Religious Services Department at: Central Office; in the Regional Catchment Areas; nor at any of its 36 prisons, there is no one to sincerely supervise or administer any important issues or situations related to the incarcerated Muslim population in Ohio.

**6.) Plaintiff Tolliver's life-long adherence to the Shafi'i school of Islamic Jurisprudence and Naqshbandi Sufism places him in a higher category of dietary requirements than the general Muslim population covered under 72-REG-01 through 12. His Halal (or Kosher) diet must be re-established and maintained.**

51. Plaintiff is a second generation Muslim American, raised by his mother in the Shafi'i school of jurisprudence (madhab) and Naqshbandi school of spiritual purification (tasawwuf). His father, a retired Imam (Islamic priest), ensured Plaintiff received a formal education in religion as a child and all of Mr. Tolliver's life he has endeavored to live in accordance with his strongly held beliefs. As it relates to this declaratory judgment action he has maintained a halal diet his entire life. He applied for and received a Kosher accommodation that were periodically challenged but never interrupted until it was taken at Belmont Correctional Institute (BeCI) in 2011.

52. Mr. Tolliver has been without his religiously necessary diet all this time due to an unjust policy that does not recognize Muslims are not one homogeneous group. A policy that is further unfair because it allows for some similarly situated Christians to receive a Kosher diet (e.g.: Sabatarians, House of Yahway, Messianic, etc.). The members of these small Christian subsets are able to receive Kosher meals even though the main body of Christians cannot. (See: Exhibit–3)

53. This disparate treatment cannot stand under the First Amendment and RLUIPA between three Abrahamic religions. Jews, Christians, and Muslims are all following Moses to varying extents and it would stand to reason that some of the adherents in each group require stricter standards than others.

54. It is ODRC's position that cost is the main factor in denying Muslims the dietary respect given other groups. That position should be ineffective. Tolliver is one of only eight (8) Muslims incarcerated in Ohio adhering to the Shafi'i madhab and the only follower of Naqshbandi tasawwuf. Hence, his dietary standard exceeds even that of other Sunni's within his Shafi'i judicial methodology due to his Naqshbandi spiritual requirements.

[Note: Evidence taken from Plaintiff by Defendants as documented in *Tolliver v. Noble* (Case No. 2:16-cv-1020) included ODRC and AIRMARK's statistical information showing that of all the Jews incarcerated by ODRC very few choose the Kosher diet. Hence, there is no reason to assume that there would be a run on the far inferior frozen MRE's of the ODRC's Kosher meal plan offered by AIRMARK if an appropriate policy correction does occur. Other evidence indicated that the cost differential between Kosher diet and regular meal is actually less than 30 cents per tray and as low as 17 cents on some meals.]

55. Wherefore, the Plaintiff in this case has questions that relate to his civil rights a declaratory judgment should issue on all questions.

## VI. Declaratory Judgments Requested

### COUNTS ONE (1) through FOURTEEN (14):

56. There is a real and justiciable controversy between Plaintiff and Defendants, concerning the following issues of Defendant's policies and practices for which Declaratory Judgment and is hereby requested:

**1.) Classification of all denominations (groups or sects) of the Islamic faith under one policy without recognition of major differences in the rites and rituals thereof results in an ineffective policy that denies religious services to Muslim Inmates.**

    a. **The terms "largest religious catchment" and "broadest range of adherents" in 72-REG-12 must mean mainstream Sunni practice or is too vague to accommodate normative Sunni Muslims. Because Sunni orthodoxy alone serves all major Islamic communities.**

    b. **Shia Muslims have significant religious differences to Sunni Muslims and thus deserve their own policy or subsection.**

    c. **The nation of Islam (NOI) is a group with little in common with mainstream Sunni Muslims and thus deserve their own policy or subsection.**

    d. **The Moorish Science Temple of America (MST) is a group with little in common with mainstream Sunni Muslims and thus deserve their own policy or subsection.**

    e. **The Nation of Gods and Earths (5%'s) are not a religion recognized by ODRC and should not be considered under the policy for Islam.**

**2.) As its written 72-REG-01, 02 and 12 lack sufficient detail for establishment of what "Jummuah Services" are and what rites and rituals must be observed to make it valid for mainstream Muslims.**

13

3.) Failure to contract Islamic Services Providers from mainstream communities, and/or to have criteria in place to ensure contractors are able, willing, and qualified to perform rites and rituals necessary to perform their duties results in a denial of services to Muslim Inmates from conventional communities.

4.) Issuing multiple contracts to one Islamic Services Provider at several different ODRC facilities denies services to Muslim Inmates around Ohio.

5.) Failure to employ any properly educated/credentialed Imams as staff members anywhere within the Religious Services Department of ODRC (i.e.: Central Office, Regional Catchment Areas, nor any of the 36 Ohio prisons):

   a. Prevents contracting quality Islamic Services Providers from mainstream communities at the individual prisons;

   b. Precludes a criteria ensuring services contracted for conform to rites and rituals of normative practice throughout the State; and,

   c. Results in a denial of services to Muslim Inmates from conventional communities.

6.) Plaintiff Tolliver's life-long adherence to the Shafi'i school of Islamic Jurisprudence and Naqshbandi Sufism places him in a higher category of dietary requirements than the general Muslim population covered under 72-REG-01 through 12. His Halal (or Kosher) diet must be re-established and maintained.

57. Declaratory Judgment and, as necessary, an appropriate entry of a permanent Injunction pursuant to R.C.2721.09 requiring Defendants to cease implementation of their errant policy and make appropriate corrections under the supervision of this Court.

58. Plaintiff adopts and incorporates the allegations set forth in the foregoing paragraphs of his Complaint as through fully set forth herein.

59. Defendants have the inherent authority to resolve these conflicts which are largely dispositive of Plaintiff's Complaint and/or will simplify matters further proceedings if necessary.

14

60. Plaintiff is entitled to resolution of these conflicts before this Court; and the Court has authority to resolve controversies and conflicts for the sake of simplification of issues for further proceedings if necessary.

61. The rights, status, and other legal obligations of Plaintiff and Defendants are uncertain and insecure, and the entry of a Declaratory Judgment by this Court will terminate the uncertainty and controversy which has given rise to this proceeding.

Respectfully submitted,

November 24, 2022

Kevin A. Tolliver (428-576)
2500 S. Avon-Belden Rd.
Grafton, OH 44044
Plaintiff, pro se.

## AFFIDAVIT AND VERIFICATION

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

November 24, 2022

Kevin A. Tolliver (428-576)
2500 S. Avon Belden Rd.
Grafton, OH 44044

Personally, Pro se.

## CERTIFICATE AND PROOF OF SERVICE

I hereby certify that a true copy of Plaintiff's document:

## ORIGINAL ACTION IN DECLARATORY JUDGEMENT

is now served upon counsel for defendant Dave Yost, 150 East Gay Street, Columbus, Ohio 43215 via placement in the legal mail system at Grafton Correctional Institute on this 24th Day of November 2022 with first class postage paid for filing with the Clerk of Courts, U.S. Marshal service and service upon all represented parties by electronic means pursuant to Rule 5. Any unrepresented party is similarly served a standard hard by regular mail copy at their known address.

By Kevin A. Tolliver (428576)

November 24, 2022

2500 South Avon Belden Road
Grafton, Ohio 44044
Plaintiff in Pro Se.