UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KEVIN A. TOLLIVER,

    Plaintiff,

  v.

OHIO DEPARTMENT OF REHABILITATION
AND CORRECTIONS, *et al.*,

    Defendants.

Civil Action 2:22-cv-4567
Judge Edmund A. Sargus, Jr.
Magistrate Judge Kimberly A. Jolson

## ORDER AND REPORT AND RECOMMENDATION

Before the Court are Defendants' Motion for Summary Judgment (Doc. 43); Plaintiff's Motion Pursuant to Rule 56(d) (Doc. 44); Plaintiff's Motion to File Interrogatories *Instanter* (Doc. 46); and Plaintiff's Request for Additional Time to Respond to Defendants' Motion for Summary Judgment (Doc. 44).

Because Plaintiff failed to diligently pursue discovery, the Court **DENIES** Plaintiff's Rule 56(d) Motion (Doc. 44), and **DENIES** his Motion to File Interrogatories *Instanter* **as moot** (Doc 46). For similar reasons, the Court also **DENIES** his Motion for additional time to file a response. (Doc. 44). The Undersigned further **RECOMMENDS GRANTING** Defendants' Motion for Summary Judgment (Doc. 43). Finally, the Court **ORDERS** Plaintiff to provide the notice detailed herein regarding his remanded 2016 claims **within twenty-one (21) days** and **SETS** a related briefing schedule.

## I.    BACKGROUND

Plaintiff, an Ohio prisoner at Grafton Correctional Institution proceeding *pro se*, is a frequent litigator in this District. (Doc. 30 at 1 (listing Plaintiff's cases)). Because two of

Plaintiff's cases were consolidated into this action (*see* Doc. 54), the Court briefly describes the allegations and procedural history of both.

## A.    The 2016 Action

In 2016, Plaintiff filed a case in this Court against Ohio Department of Rehabilitation and Correction ("ODRC") employees and contractors, including some of the Defendants in this action. *Tolliver v. Noble, et al.* (the "2016 Action"), No. 2:16-cv-1020 (S.D. Ohio Oct. 25, 2016), Doc. 1. In that case, Plaintiff eventually raised claims under 42 U.S.C. § 1983; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.*; and state law based upon alleged issues with Islamic service providers and incidents of retaliation at various Ohio prisons. *Id.* at Doc. 30.

Most relevant here, Plaintiff raised a third-party breach of contract claim based upon Islamic service providers' alleged failure to provide "Jumah service" every Friday "in accordance with [Plaintiff's] faith requirements" and religious study sessions ("Taleem"). *Id.* at ¶¶ 18–19 (citation modified); *see also id.* at ¶¶ 18–32. According to Plaintiff, these failures are "major[ly]" caused by "various defendants award[ing] multiple contracts to one contractor without sufficient screening or supervision to [ensure] providers are qualified to perform the rites and rituals, or that they possess resources and desire to timely serve mainstream and/or normative adherents of the Islamic faith." *Id.* at ¶ 23 (citation modified). Plaintiff also attributes the failures to the Islamic service providers' membership in "minority sects" or "denominations with vastly different understandings and views from the larger mainstream." *Id.* at ¶ 24.

As for his RLUIPA claim, Plaintiff alleges that "ODRC Defendants (Administrators and Staff)" employ improper contractors to "keep the numbers of Muslims who use chapel services down" and "create more opportunities to conserve resources for Christian services." *Id.* at ¶ 50

2

(citation modified).  He further states that Muslim prisoners were forced to choose between evening meals and prayers, lacked access to religious texts, and could not participate in certain services and traditions.  *Id.* at ¶ 53.  At base, he alleges that "ODRC Policies 72 Reg 01 through 12 are ineffective as they apply to Islam"; "create[] conditions favorable to abuse by contractors, administrators, and staff"; and thus violate RLUIPA.  *Id.* at ¶¶ 54–55.

### B.    The 2022 Action

During the 2016 Action, Plaintiff amended his pleading once, though he tried to do so again on many occasions.  2016 Action, No. 2:16-cv-1020 (S.D. Ohio), Doc. 30 (Amended Complaint); *see also* Docs. 93, 100, 153, 164, 165, 166, 167 (Plaintiff's various amendment attempts).  When those efforts failed, Plaintiff filed the instant case on December 29, 2022 (the "2022 Action").  *Id.* at Doc. 208; (*see also* Doc. 1; Doc. 54 at 6 ("Because the court rejected these [amendment] attempts Plaintiff filed an Original Action in Declaratory Judgment before the same judge and magistrate.  It is the causal religious issue proceeding as *Tolliver v. Annette Chambers Smith* (S.D. Ohio Case No. 2[2]-cv-4567)[.]"))).

Here, Plaintiff sues Defendants ODRC; ODRC Director Annette Chambers-Smith; Chief of Religious Services Mike Davis; Chief of Holistic Services Jennifer Urrah; and unidentified Jane and John Doe Administrators and Islamic Services Contractors.  (Doc. 4 at 30; Doc. 9 at 10–11; Doc. 14 (adopting Docs. 4, 9)).  He describes this action "as a direct challenge to practices and policies of the [ODRC]."  (Doc. 4 at 4).  The Court allowed him to proceed against ODRC under RLUIPA and against Chambers-Smith, Davis, Urrah, and the unidentified Doe Defendants under RLUIPA, Section 1983, and state contract law.  (Doc. 9 at 11).  Construed generously, Plaintiff alleges the following claims for declaratory and injunctive relief (Doc. 8 at ¶ 1), as previously summarized by the Court's orders (Docs. 4, 9, 14):

1.      Defendants improperly classify "all denominations (groups or sects) of the Islamic faith under one policy without recognition of major differences in the rites and rituals thereof," which "results in an ineffective policy that denies religious services to Muslim Inmates," in violation of RLUIPA and the First Amendment's Free Exercise and Establishment Clauses. (Doc. 4 at 7; Doc. 9 at 11; *see also* Doc. 8 at ¶¶ 28–30, 44, 46).

2.      "The terms 'largest religious catchment' and 'broadest range of adherents' in 72-REG-12 must mean mainstream Sunni practice or is too vague to accommodative normative Sunni Muslims" in violation of RLUIPA and the First Amendment's Free Exercise and Establishment Clauses. (Doc. 4 at 7; Doc. 9 at 11 *see also* Doc. 8 at ¶¶ 29–31, 44–45).

3.      "As its written 72-REG-01, 02 and 12 lack sufficient detail for establishment of what 'Jummuah Services' are and what rites and rituals must be observed to make it valid for mainstream Muslims," in violation of RLUIPA and the First Amendment's Free Exercise and Establishment Clauses. (Doc. 4 at 8; Doc. 9 at 11; *see also* Doc. 8 at ¶¶ 29–31, 44).

4.      "Failure to contract Islamic Services Providers from mainstream communities, and/or to have criteria in place to ensure contractors are able, willing, and qualified to perform rites and rituals necessary to perform their duties results in a denial of services to Muslim Inmates from conventional communities," in violation of RLUIPA and the First Amendment's Free Exercise and Establishment Clauses. (Doc. 4 at 8; Doc. 9 at 11; *see also e.g.* Doc. 8 at ¶ 44).

5.      "Issuing multiple contracts to one Islamic Services Provider at several different ODRC facilities denies services to Muslim Inmates around Ohio," in violation of RLUIPA and the First Amendment's Free Exercise and Establishment Clauses. (Doc. 4 at 8; Doc. 9 at 11; *see also* Doc. 8 at ¶¶ 37, 44).

6.      "Failure to employ any properly educated/credentialed Imams as staff members anywhere within the Religious Services Department of ODRC (i.e.: Central Office, Regional Catchment Areas, nor any of the 36 Ohio prisons) . . . [p]revents contracting quality Islamic Services Providers from mainstream communities at the individual prisons," "[p]recludes a criteria ensuring services contracted for conform to rites and rituals of normative practice throughout the State," and "[r]esults in a denial of services to Muslim Inmates from conventional communities," in violation of RLUIPA and the First Amendment's Free Exercise and Establishment Clauses. (Doc. 4 at 8; Doc. 9 at 11; *see also e.g.*, Doc. 8 at ¶¶ 16, 19, 22, 26, 76).

7.      Defendants use criteria for who qualifies for "kosher/halal religious meals," which "results in all Muslims being denied kosher/halal while Christians receive an individualized evaluations resulting in many approvals [of] kosher diet," in violation of the Fourteenth Amendment's Equal Protection Clause. (Doc. 8 at ¶ 28b; *see also* Doc. 9 at 7–8, 11).

4

8.  Defendants' handling of Islamic Service Contractors and their contracts "constitute deliberate indifference" and/or cruel and unusual punishment under the Eighth Amendment. (Doc. 8 at ¶¶ 33–34; *see also* Doc. 9 at 10).

9.  Plaintiff "[has] suffered from a breach of third-party contract" because Defendants assign/accept "multiple contracts without sufficient qualifications, ability, or willingness to perform on contracts they accept." (Doc. 8 at ¶¶ 6, 12; *see also* Doc. 9 at 10 (allowing a contract claim to proceed and citing Doc. 8 at ¶¶ 3, 6, 12–13)).

For ease of reference, the Undersigned refers to claims one through six as Plaintiff's "RLUIPA and First Amendment" claims; to claim seven as Plaintiff's "Equal Protection" claim; to claim eight as Plaintiff's "Eighth Amendment" claim; and to claim nine as Plaintiff's "Breach of Contract" claim.

### C.  Procedural History of Both Cases

For nearly three years, the 2016 and 2022 Actions proceeded simultaneously. In the 2016 Action, the Court dismissed all Defendants besides Christler, Sibalski, Shahid, and Islam on the pleadings and eventually granted summary judgment in favor of Defendants Christler, Sibalski, and Islam. *See* 2016 Action, No. 2:16-cv-1020 (S.D. Ohio), Doc. 117 at 6; Docs. 172, 183. Plaintiff received a judgment at trial against Defendant Shahid. *Id.* at Doc. 258. On December 18, 2023, Plaintiff appealed these decisions to the Sixth Circuit. *Id.* at Doc. 261.

Meanwhile, in this action, the pleading stage lasted almost two years. (*Compare* Doc. 1 (original complaint filed December 29, 2022); Doc. 8 (amended complaint filed June 1, 2023) *with* Docs. 30, 31 (denying Defendants' motion to dismiss); Doc. 32 (Defendants' answer, filed on October 23, 2024)). On October 25, 2024, the Court issued a case schedule and set the discovery deadline for April 24, 2025, and the dispositive motion deadline to May 27, 2025. (Doc. 33). The Court also set a trial date of February 2, 2026. (Doc. 34).

Then, on November 11, 2024, the Sixth Circuit ruled on Plaintiff's appeal of the 2016 Action. 2016 Action, No. 2:16-cv-1020 (S.D. Ohio Nov. 15, 2024), Doc. 272. While the panel mostly affirmed the Court's judgment, it concluded that the Court "did not decide his RLUIPA claim and related breach-of-contract claim" and remanded for the Court to consider Plaintiff's request "to have these claims consolidated with his separate, similar lawsuit." *Id.* Ultimately, the Court consolidated the RLUIPA and breach-of-contract claims into this action and noted that Plaintiff asserted that these claims were proceeding in the 2022 action all along. (Doc. 54 at 6 (discussing Plaintiff's representation to the Sixth Circuit "that he filed the 2022 Action to ensure those claims would be adjudicated")).

After the Court issued the case schedule in the 2022 Action, neither party filed any motions during the discovery period. (*Cf.* Doc 35 (settlement offer filed by Plaintiff)). On May 27, 2025, Defendants moved for a one-week extension of the dispositive motion deadline. (Doc. 36). Plaintiff opposed the extension and seemed to assert that some discovery was outstanding. (Doc. 38). Yet, after the parties conferred, the parties represented no discovery requests remained. (Doc. 41). So, the Court granted the extension, and Defendants filed a timely Motion for Summary Judgment on July 1. (Doc. 43).

Between July 25 and August 11, Plaintiff submitted a flurry of filings. First, he filed a motion to conduct additional discovery under Federal Rule of Civil Procedure 56(d). (Doc. 44). He also filed a request for an extension of time to respond to Defendants' summary judgment motion. (*Id.*). Then, days later, Plaintiff filed seven documents, which contained his proposed interrogatories and a motion to file them on the docket *instanter*. (Docs. 46, 47, 48, 49, 50, 51, 52). Defendants opposed Plaintiff's requests, and Plaintiff replied. (Docs. 45, 53).

Defendants' Motion for Summary Judgment, Plaintiff's Motion for Rule 56(d) relief and an extension of time to respond, and Plaintiff's Motion to file his proposed Rule 56(d) discovery requests are ripe for review.  (Docs. 43, 44–53).

## II.    STANDARD

A court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## III.    DISCUSSION

Culminating years of litigation, on July 1, Defendants filed a timely Motion for Summary Judgment totaling over 200 pages of briefing, witness statements, and administrative records. (Doc. 43).  Instead of meaningfully responding, Plaintiff moves for additional discovery under Federal Rule of Civil Procedure 56(d) and for more time to file his opposition.  (Doc. 44).  These requests are just the latest chapter in Plaintiff's history of dilatory conduct in this Court.  Plaintiff's requests are denied, and Defendants' Motion should be granted.

## A.     Plaintiff's Rule 56(d) Request

Plaintiff's Rule 56(d) Motion is easily denied.  (Doc. 44).  While the Motion is substantively lacking, there is a larger problem.  At bottom, Plaintiff failed to pursue discovery and prepare his case diligently.  Although he wants to do so now, Rule 56(d) is not a mechanism to fix such mistakes.

### 1.     Legal Standard

Rule 56(d) of the Federal Rules of Civil Procedure establishes the procedure for a party to obtain additional discovery necessary to respond to a summary judgment motion:

> When Facts are Unavailable to the Nonmovant.  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1)     defer considering the motion or deny it;
> (2)     allow time to obtain affidavits or declarations or to take discovery; or
> (3)     issue any other appropriate order.

Fed. R. Civ. P. 56(d).

The purpose behind the rule is to make sure "that plaintiffs receive a full opportunity to conduct discovery to be able to successfully defeat a motion for summary judgment." *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019).  But a plaintiff does not obtain Rule 56(d)'s benefits automatically.  *Id.* (noting that plaintiffs have "no absolute right to additional time for discovery under Rule 56").  Rather, whether to allow additional discovery is soundly within the trial court's discretion.  *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 426 (6th Cir. 2009).

To obtain relief under Rule 56(d), the moving party must submit an affidavit "indicat[ing] the need for discovery, what material facts may be uncovered, and why the information has not been previously discovered." *Id.* at 426 (citing *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000)).  This affidavit must be specific, and a Rule 56(d) motion is properly denied "where the requesting party makes only general and conclusory statements . . . regarding the need

for more discovery." *Enyart v. Franklin Cnty.*, No. 2:09-cv-687, 2013 WL 1915099, at *4 (S.D. Ohio May 7, 2013) (citation modified).

Additionally, courts consider five factors (the "*Plott*" factors):

(1) when the party seeking discovery learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would change the ruling; (3) how long the discovery period had lasted; (4) whether the party seeking discovery was dilatory in its discovery efforts; and (5) whether the party moving for summary judgment was responsive to discovery requests.

*Cressend v. Waugh*, No. 2:09-cv-1060, 2011 WL 883059, at *2 (S.D. Ohio Mar. 11, 2011) (citing *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008)) (citation modified); *see also Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1196 (6th Cir. 1995).

The fourth factor is especially important. Generally, motions brought under Rule 56(d) "should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Doe*, 928 F.3d at 491. "Stated differently, the non-moving party must show that he exercised 'due diligence both in purposing discovery before the summary judgment initiative surfaces and in pursuing an extension of time thereafter.'" *Dallas v. Koskela*, No. 2:17-cv-198, 2020 WL 6598309, at *5 (W.D. Mich. Mar. 4, 2020) (quoting *Resolution Tr. Corp. v. N. Bridge Assocs., Inc.*, 22 F.3d 1198, 1203 (1st Cir. 1994)).

2.    *Plaintiff's Motion*

Plaintiff seeks several forms of relief through his Rule 56(d) Motion. First, he wants new copies of several pages of exhibits attached to Defendants' Motion for Summary Judgment and "21 days from the receipt of these corrected copies" to obtain an affidavit from an expert to counter Defendant Davis's declaration. (Doc. 44 at 1 (referencing Doc. 43-3 at 119, 125–58)). Plaintiff then wants to propound ten interrogatories on Defendants Davis and Urrah and five interrogatories on three contractors briefly referenced in Defendants' Motion. (*Id.* at 1–2). Plaintiff asserts that

9

these requests "relate directly to issues raised by the Defendants' motion and in no way relate to [Plaintiff's] earlier failed discovery request." (*Id.* at 1–2). But these assertions are false. The Court begins with the factors related to Plaintiff's discovery efforts before turning to the substance of his requests.

a. *Length of Discovery, Plaintiff's Diligence, and Defendants' Responsiveness to Discovery Requests*

The Court begins with the third, fourth, and fifth *Plott* factors, which concern the length of the discovery period, Plaintiff's diligence in pursuing discovery, and Defendants' responsiveness to discovery requests. *CenTra, Inc.*, 538 F.3d at 420. None of these factors weigh in Plaintiff's favor.

As discussed, Plaintiff filed this action on December 29, 2022 (Doc. 1), though the issues involved are strongly tied to those raised in the 2016 Action. (*See, e.g.*, Doc. 1-1 at 2 (Plaintiff's first pleading, which says that this action "relates to Declaratory Judgments raised but not addressed by this court within collateral complaint *Tolliver v. Noble* (Case No. 2:16-cv-1020)"); Doc. 8 at 7 (noting, in Plaintiff's Amended Complaint, that this case addresses issues raised but not ruled upon in the 2016 Action); Doc. 54 (consolidating the cases, noting their similarities, and discussing that Plaintiff filed this action because of rulings in the 2016 Action)). After nearly two years in the pleading stage, the Court issued a case schedule on October 25, 2024, and gave the parties six months for formal discovery. (Doc. 33 (setting the deadlines for discovery and dispositive motions to April 24, 2025, and May 27, 2025)). Plaintiff filed nothing related to discovery during that time. (*Cf.* Doc. 35 (filing related to a settlement offer)).

Then, on May 27, 2025, Defendants moved for a seven-day extension of time to file dispositive motions. (Doc. 36). In response, Plaintiff asserted, for the first time, that Defendants "fail[ed] to participate in discovery." (Doc. 38 at 1). Although Plaintiff expressly did not ask to

extend the discovery period (*id.* at 1–2), the Court ordered the parties to confer on any outstanding discovery requests. (Doc. 39). Two weeks later, they filed a joint status report. (Doc. 41). In it, Plaintiff said he propounded discovery requests on November 22, 2024, but he sent the request to Ohio Attorney General Dave Yost, not Defendants' counsel. (*Id.* at 1). For five months after that, he did nothing. He did not follow-up on his discovery requests when Defendants did not respond, nor did he notify the Court of any outstanding discovery. (*Id.* at 1–2). And he admitted that he did not begin preparing "a notice of unfulfilled discovery" until June 3, 2025—a week after Defendants filed their extension request. (*Id.* at 2). As justification for his failure to conduct discovery, Plaintiff explained that he had been focused on other litigation. (*Id.* at 2).

After this status report, the Court found that Plaintiff failed to diligently pursue discovery and granted Defendants' extension. (Doc. 42 at 3–4). Defendants filed their Motion for Summary Judgment on July 1. (Doc. 43). Three weeks later, instead of responding to that filing, Plaintiff submitted the instant Rule 56(d) request. (Doc. 44). And Plaintiff represented he would send his proposed discovery requests to the Court by July 25. (*Id.*). But again, Plaintiff did not keep his word. He did not mail the interrogatories to the Court and Defendants until July 31, and the Court did not receive them until August 5. (Doc. 46 (blaming issues with the law library)). And only recently, Plaintiff provided notice that he served discovery requests "relating to [Defendants'] Summary Judgment Motion." (Doc. 55). But this does not help him much either. By Plaintiff's own admission, he waited more than two months after Defendants filed the motion at bar to send these requests. (*Id.*).

Undoubtedly, this record shows Plaintiff did not diligently pursue discovery. *See, e.g.*, *Bloodworth v. Timmerman-Cooper*, No. 2:10-cv-4567, 2013 WL 950931, at *2 (S.D. Ohio Mar. 12, 2013) (denying Rule 56(d) relief where the plaintiff did not conduct discovery and made a

belated request to do so after the defendants moved for summary judgment); *Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1, 8 (6th Cir. 2003) (affirming a court's decision to deny additional discovery and grant summary judgment where the plaintiff had a year to conduct discovery but did not file a motion to compel until after the discovery deadline); *FTC v. EMA Nationwide, Inc.*, 767 F.3d 611, 624–25 (6th Cir. 2014) (affirming denial of Rule 56(d) relief where the defendants had five months to conduct discovery, did not file a formal discovery request until weeks before the deadline, and did not pursue other forms of discovery).  He was not even diligent in filing his proposed interrogatories to support his Rule 56(d) request.  What's more, Plaintiff never asked to extend the discovery deadline.  (*Cf.* Doc. 38 (opposing Defendants' extension but expressly saying he was not "ask[ing] for extension of the schedule")).  Ultimately, this case has been pending since December 2022, and Plaintiff could have researched his case and determined what discovery he needed for the years this case remained in the pleadings and in formal discovery. He did not.  Instead, he chose to focus on other litigation.  (Doc. 41 at 2).  That choice has consequences.

In sum, the third and fourth *Plott* factors weigh against Plaintiff, and the fifth is neutral at best, since Plaintiff sent no discovery requests to Defendants at all.

### b.  *Plaintiff's Awareness of the Subject of the Desired Discovery*

Plaintiff fares no better on the first factor, which considers when he learned of the issues that are the subjects of the requested discovery.  "This factor primarily pertains to situations where there was something that prevented a party from learning about a subject of desired discovery until after some discovery had already been sought."  *Doe*, 928 F.3d at 492–93 (citation modified). Here, nothing prevented Plaintiff from seeking the requested materials sooner.

To begin, Plaintiff seeks copies of documents attached to Defendants' Motion for Summary Judgment, which he says are illegible and unusable.  (Doc. 44 at 1).  Yet according to Defendants, these documents "are copies of the very same pages [Plaintiff] himself submitted, and are just as illegible, as were those he previously provided prison officials in support of his requests for religious accommodation and which he filed in previous cases."  (Doc. 45 at 1 (saying no clearer copies exist)).  So, legibility aside, it is clear Plaintiff knew of the documents before now, despite his assertions otherwise.  (Doc. 53 at 2).  Plaintiff could have requested copies during discovery to "prove" his claims or to address Defendants' "credibility and disparate treatment."  (*Id.* at 2; *see also id.* at 1 (arguing Plaintiff's original copies were less damaged); Doc. 45 at 1 (noting Plaintiff submitted these documents to prison officials or filed them in his other cases)).  The fact that he did not doesn't mean he was unaware of them for the purposes of Rule 56(d).  *Cf. Burnett v. Herron*, No. 18-cv-12471, 2023 WL 2712476, at *9 (E.D. Mich. Mar. 30, 2023) (finding a plaintiff was aware of the existence of his medical records when he filed his complaint based upon medical issues).

Next are Plaintiff's proposed interrogatories to Defendants Urrah and Davis.  For Urrah, Plaintiff submits three questions concerning her job duties and her communications with other Defendants about Defendants' Motion.  (Doc. 48 at 2).  Plaintiff does not explain why he couldn't inquire about Defendant Urrah's job duties during discovery or why this information matters now.  (*Id.*; *see also* Doc. 53 at 2).

For Defendant Davis, Plaintiff wants discovery related to a declaration he submitted for Defendants' Motion.  (Doc. 44 at 1–2).  Specifically, Plaintiff asks for definitions within regulations, clarification about Defendant Davis's understanding of Islamic practices, explanations of Defendants' security concerns, policies for Christian prisoners, statistics on various prisoners'

faiths, complaints Davis received about ODRC staff and Islamic service providers, information on meetings Davis had about services for Muslim prisoners, and a list of Islamic service providers. (Doc. 51 at 1–7). Yet these topics are all related to issues Plaintiff raised in his Amended Complaint. (*Compare* Doc. 51 at 2–7 (asking for Defendant Davis's understanding of requirements for Jumah service and Khutba; differences between ODRC policies for Christian and Muslim prisoners; statistics on faith groups within Ohio's prisons; information on ODRC's Islamic service providers; and Defendant Davis's understanding of requirements) *with* Doc. 8 at ¶¶ 8–9, 11–12, 15–16, 22, 24, 32, 57, 64 (saying ODRC's leadership includes no Imams and challenging ODRC's qualifications for Islamic service providers); *id.* at ¶¶ 11, 16, 20–21, 28b, 30, 40, 43, 50, 72–73 (discussing differing treatment between Christian and Muslim prisoners); *id.* at ¶¶ 19, 28a, 28f, 36, 37–39, 55, 69 (discussing issues with ODRC's requirements for Jummuah services); *id.* at ¶¶ 29, 30, 50, 67 (referencing the policy about which he wants Defendant Davis to answer interrogatories); *id.* at ¶ 74 (referencing statistics on numbers of Jewish prisoners within ODRC that Plaintiff obtained in the 2016 Action)). Simply put, these matters have been at the heart of this case all along, and Plaintiff simply failed to conduct discovery on them when he had the chance.

Lastly, Plaintiff seeks to propound interrogatories to three Imams referenced in Defendants' Motion about their understanding of various Islamic practices, their experiences as Islamic service providers for ODRC, and their programming recommendations for ODRC. (Doc. 49 at 2–3; Doc. 50 at 2–3; Doc. 52 at 2–3). Again, these are not recently discovered issues. ODRC service providers' practices, credentials, and understanding of Islamic rites and rituals are at the forefront of Plaintiff's Amended Complaint. (*See, e.g.*, Doc. 8 at ¶¶ 12, 19, 22, 35, 39, 49, 58, 64, 67, 68 (discussing issues with Islamic service providers' qualifications and practices, as well as

two specific contractor's credentials and work history)).  Plus, Plaintiff's requests are procedurally improper.  Rule 33 allows a party to serve interrogatories only on another party, and the three Imams are not defendants in this action.  (*See* Doc. 8 at ¶¶ 8–12); Fed. R. Civ. P. 33(a)(1).

In sum, the substance of Plaintiff's request shows the true motivation behind his request. Plaintiff wants to reopen discovery on issues he failed to pursue sooner.  None of the proposed discovery addresses new matters Plaintiff was unaware of before Defendants moved for summary judgment.  As such, the first *Plott* factor falls against him.

### c.   *Impact of the Desired Discovery*

Finally, the Court addresses the second *Plott* factor: the impact the requested discovery would have on the outcome of this case.  *Plott*, 71 F.3d at 1196.  As detailed below, Plaintiff's claims fail because he did not exhaust his administrative remedies or because he should have filed them sooner.  Although Plaintiff briefly notes "earlier attempts to exhaust remedies and appeals prior to the ODRC adoption of electronic process," none of the proposed discovery goes to this issue.  (Doc. 53 at 2; *see* Docs. 44, 47, 48, 49, 50, 51, 52).  As for the other issues in the case, Plaintiff's reasons for why he needs the at-issue discovery are conclusory and vague.  *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004) (saying "[b]are allegations or vague assertions of the need for discovery are not enough" and that a party moving for Rule 56(d) relief must offer with "some precision . . . exactly how he expects [the requested] materials would help him in opposing summary judgment").  For instance, Plaintiff generally states certain information would be "relevant" or go to "credibility and disparate treatment" but nothing more.  (Doc. 53 at 2; *see also* Doc. 44 at 1–2 (saying what discovery he wants but no specific reasons why)).  And even assuming the discovery responses would help Plaintiff, the other factors weigh heavier.  *See, e.g.*, *FTC*, 767

15

F.3d at 623 ("This Court's main inquiry is whether the moving party was diligent in pursuing discovery." (citation modified)).

***

At base, Plaintiff admits he prioritized other litigation and ignored this case for many months. (Doc. 41 at 1–2). He did not attempt any discovery until Defendants moved for summary judgment. (Doc. 44). Rule 56(d) is not a vehicle for fixing this type of neglect. Given that most of the *Plott* factors decidedly weigh against him, the Court **DENIES** Plaintiff's Rule 56(d) requests and **DENIES** his Motion to file his interrogatories *instanter* **as moot**. (Docs. 44, 46).

## B. Plaintiff's Extension Request

Now, the Court must decide whether Plaintiff should have more time to respond to Defendants' Motion. As discussed, Defendants filed their summary judgment motion on July 1, meaning Plaintiff's opposition was due July 22. (Doc. 43); S.D. Ohio Civ. R. 7.2(a)(2) ("Any memorandum in opposition shall be filed within twenty-one days after the date of service of the motion."). In lieu of a response, on July 25, Plaintiff asked for discovery under Rule 56(d) and an indefinite extension of time to oppose Defendants' Motion. (Doc. 44). Specifically, Plaintiff wants "21 days from the receipt of" the requested Rule 56(d) relief to file his response. (*Id.* at 1).

Under Federal Rule of Civil Procedure 6(b)(1), the Court may grant extensions of time "for good cause." The primary factors the Court must consider are "the moving party's diligence in attempting to meet the deadlines" and "prejudice to the nonmoving party." *Layman v. United Parcel Serv., Inc.*, No. 3:17-cv-738, 2019 WL 1966123, at *3 (W.D. Ky. May 2, 2019) (citing *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002)). Ultimately though, extensions are discretionary. "[E]ven if a party demonstrates good cause, a district court is not required to grant

16

a motion to extend time." *Ott v. Fed. Home Loan Mortg. Corp.*, 535 F. App'x 488, 489 (6th Cir. 2013).

None of Plaintiff's given reasons establish good cause. To start, Plaintiff says that an extension will allow him "to receive an affidavit contra from an expert on some of the issues raised" by Defendants' Motion. (Doc. 44 at 1). But this is just speculation, as Plaintiff does not identify this expert or say whether the expert has even agreed to help. (*Id;* Doc. 53 at 2); *see, e.g.*, *Ewert v. Holzer Clinic, Inc.*, No. 2:09-cv-131, 2010 WL 2854125, at *3 (S.D. Ohio 2010) (denying an extension request based on speculation about the substance of future deposition testimony).

Next, Plaintiff asserts problems with the law library's computers prevented him from copying and printing necessary documents and, seemingly, from researching legal issues. (Doc. 44 at 2; Doc. 53 at 2). Plaintiff offers no proof of his alleged law library issues, and notably, Plaintiff has used this excuse to obtain extensions before. (*See* Doc. 44 at 2 (asserting law library issues with no support); Doc. 10 (requesting an extension because of "limited access to prison law library")). What's more, Plaintiff appears to say these issues recently improved and that it takes only "three (3) days to get prints and copies." (Doc. 44 at 2 (saying the law library had issues "[f]or over a month" but that "there has been progress")). Plaintiff does not explain why a three-day printing delay necessitates an open-ended deadline for him to file a response due over two months ago. (Doc. 44); *see, e.g.*, *Washington v. Miami Cnty.*, No. 3:20-cv-173, 2022 WL 22715101, at *3 (S.D. Ohio Aug. 29, 2022) (denying a late extension request and noting that the plaintiff did not identify when he lost access to writing materials and the law library).

Finally, Plaintiff seemingly asserts that the "very large number of cases" cited in Defendants' Motion warrants an extension. (Doc. 53 at 2). The Court disagrees. Plaintiff had many years to research and prepare his case, considering he's been litigating similar issues in this

Court since 2016.  (*See* Doc. 54 at 6 (noting Plaintiff's representation that he filed this action after attempts to amend in the 2016 Action were denied)).  Nowhere does he explain why he failed to do so until Defendants filed their Motion.  *See, e.g.*, *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 594 (6th Cir. 2012) (affirming a denial of an extension of time to respond to a summary judgment motion where the extension resulted from counsel "wait[ing] until the last minute to begin working on his motions").

Importantly, this is not the only time Plaintiff has asked for an extension, missed a deadline, or filed other things to buy more time.  Consistent across Plaintiff's lengthy history of litigating in this District are his efforts to delay a resolution in every one of his cases.  For example:

- In all his cases, including this one, Plaintiff asked for or received numerous extensions. (*See, e.g.*, Docs. 11, 20, 26); *Tolliver v. Ohio Parole Board, et al.* ("*Tolliver II*"), No. 2:22-cv-4566 (S.D. Ohio), Docs. 7, 18; The 2016 Action, Case No. 2:16-cv-1020, Docs. 53, 81, 83, 88, 98, 159.

- Instead of following the Court's orders, Plaintiff often filed unauthorized amendments, moved to amend even after the Court denied previous amendments, or asked to stay the case entirely.  *Compare Tolliver II*, No. 2:22-cv-4566 (S.D. Ohio Apr. 5, 2024), Doc. 16 (noting that Plaintiff never identified Doe Defendants or submitted service documents and ordering him to file service copies and forms) *with id.* at Docs. 17, 18 (filing, instead of service documents, an unauthorized amendment, which was stricken from the docket); *compare id.* at Doc. 18 (ordering Plaintiff to provide service copies and forms) *with* Doc. 21 (moving to stay the case for 90 days); *compare id.* at Doc. 23 (noting, on January 6, 2025, that the stay ended December 18, 2024, and ordering Plaintiff to file a status report "regarding his intention to proceed with this action") *with id.* at Docs. 24, 25, 26 (filing a status report, an evidentiary motion, and another unauthorized complaint)).  *Compare* The 2016 Action, No. 2:16-cv-1020 (S.D. Ohio Aug. 31, 2020), Doc. 92 (denying Plaintiff's motion to appoint counsel and ordering him to submit service forms for two defendants) *with id.* at Doc. 93 (moving for a stay instead, so Plaintiff could amend a second time); *compare id.* at Doc. 94 (warning Plaintiff "there is little basis to permit . . . an amended complaint here") *with* Doc. 100 (moving to amend anyway); *compare id.* at Doc. 112 (denying that motion to amend and setting a case schedule); Doc. 149 (extending the dispositive motion deadline) *with* Doc. 153 (objecting to that extension and incorrectly asserting Plaintiff had a right to amend); *compare id.* at Doc. 159 (granting Plaintiff an extension to respond to a summary judgment motion) *with* Docs. 164, 165 (moving to amend again).

- Multiple times, when the Court noted Plaintiff missed a deadline, Plaintiff represented that he sent documents on time, but the Court mysteriously did not receive them. (*See, e.g.*, Docs. 26 (granting an extension to respond to a motion to dismiss *sua sponte* when Plaintiff did not file anything by the deadline), 27 (saying Plaintiff mailed his response on April 27, 2024, but the Court apparently didn't receive it); Doc. 41 (noting Plaintiff claimed to have sent discovery requests to the wrong person in November 2024, but also saying he started drafting a notice of unfulfilled discovery in June 2025)); *Tolliver II*, No. 2:22-cv-4566, Docs. 18, 19, 20 (saying, in response to an order to file service forms and copies, that he did not receive the order and that he sent in a motion to stay the case, which the Court never received).

- A few times in the 2016 Action, Plaintiff even filed meritless appeals, which resulted in further extensions to the case schedule.  *See* The 2016 Action, Case No. 2:16-cv-1020, Docs. 78 (granting a motion to voluntarily dismiss the appeal, after Plaintiff's motion for leave to proceed *in forma pauperis* on appeal was denied because his appellate arguments lacked merit), 126 (dismissing Plaintiff's appeal because the appellate court lacked jurisdiction), 198 (same).

Because of this conduct, the 2016 Action took nine years to resolve, and Plaintiff's other case filed in 2022, *Tolliver II*, is still in the pleading stage.  *See* The 2016 Action, No. 2:16-cv-1020, Doc. 274 (closing the case on August 13, 2025); *Tolliver II*, No. 2:22-cv-4566, Doc. 30 (moving to file a second amended complaint, after two unauthorized amendments were previously stricken from the docket).  These facts are unsurprising, given Plaintiff's conduct in this case. Here, Plaintiff failed to engage in discovery, research the relevant legal issues, or seek expert assistance for over two years.  (Doc. 42 at 3–4 (discussing Plaintiff's failure to pursue discovery)). Then, at the last minute, he moved for Rule 56(d) relief and an extension of time to respond to Defendants' summary judgment motion.  (Doc. 44).  Certainly, such conduct does not show Plaintiff diligently attempted to meet deadlines.  *See, e.g.*, *Barnes v. Malinak*, No. 3:15-cv-556, 2017 WL 3161686, at *2–3 (E.D. Tenn. July 25, 2017) (finding no good cause to extend a discovery deadline where the plaintiffs delayed taking or scheduling depositions for five months and did not produce an expert report on time); *Dunning v. War Memorial Hosp.*, 534 F. App'x 326, 332 (6th Cir. 2013) (affirming a trial court's denial of an extension, even where the court did

19

not previously warn the parties no further extensions would be granted, where counsel repeatedly "fail[ed] to adhere to the court's scheduling orders").  Rather, it appears this extension request is just another attempt to cure past failures and postpone the end of this case.  These delay tactics stop here.

Also worth noting, Defendants would be prejudiced by an extension.  Currently, a trial in this matter is scheduled for February 2, 2026, with pre-trial deadlines beginning in December 2025.  (Doc. 34).  Although Plaintiff baldly asserts he would be ready for trial on February 2 (Doc. 53 at 2), the Court does not share his optimism, given Plaintiff's undefined extension request and his history of missing deadlines.

At bottom, Plaintiff's dilatory conduct and explanations do not meet the good cause standard for an extension of time.  Plaintiff's Motion for an extension of time (Doc. 44) is thus **DENIED**.

### C.    Defendants' Motion for Summary Judgment

Next for the Court's consideration, Defendants present a myriad of reasons why they are entitled to summary judgment.  (Doc. 43 at 11–17 (arguing Plaintiff failed to exhaust his administrative remedies and the statutes of limitations bars his claims), 17–38 (arguing Plaintiff's Section 1983, RLUIPA, and state law claims fail on their merits), 39 (arguing qualified immunity applies)).  But the Undersigned need only address a few.  Ultimately, Plaintiff's 2022 claims are unexhausted or barred by *res judicata,* and Defendants are entitled to summary judgment.  The Undersigned also separately considers Plaintiff's 2016 claims.

###### 1.    Exhaustion

The Undersigned begins by summarizing ODRC's administrative remedy mechanisms before turning to Plaintiff's specific efforts to exhaust his administrative remedies.[1]

###### a.    ODRC's Policies

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e, *et seq.*, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." *Lamb v. Kendrick*, 52 F.4th 286, 292 (6th Cir. 2022) (quoting 42 U.S.C. § 1997e(a)).  To comply with this requirement, a prisoner must follow the applicable procedural rules at his correctional institution.  *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)).  Said differently, a prisoner must "take advantage of each step the prison holds out for resolving the claim internally and by following the critical procedural rules of the prison's grievance process" to properly exhaust his claims.  *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (internal quotation omitted).

Because Plaintiff's claims concern religion, two different policies apply.  To begin, for "inmate complaints related to any aspect of institutional life . . . including . . . conditions of confinement," prisoners must use a three-step process.  Ohio Admin. Code 5120-9-31(K) (effective from May 1, 2008, to April 4, 2019).  First, "[w]ithin fourteen calendar days of the date of the event giving rise the complaint," the prisoner must file an informal complaint to the direct

---

[1] Defendants attached to their Motion the most up-to-date versions of the relevant policies, including ODRC Policy 72-REG-01, 72-REG-02, and Ohio Administrative Code 5120-9-31.  (Doc. 43-3 at 5–15).  Upon review, the current policies superseded earlier polices that were in place during the time when Plaintiff allegedly pursued or would have pursued his administrative remedies.  (*See id.* at 9, 10, 16 (noting the policies superseded others, or that the Ohio Administrative Code was modified).  The Court has reviewed previous versions of these policies.  *See* 2016 Action, No. 2:16-cv-1020 (S.D. Ohio Mar. 20, 2019), Doc. 46-6 (earlier version of 72-REG-01), 46-7 (earlier version of 72-REG-02) ("72-REG-02 eff. 2018"); Ohio Admin. Code 5120-9-31 (effective from May 1, 2008, to April 4, 2019).  The policies, for exhaustion purposes in this case, do not materially differ.  Still, the Court cites the earlier policies for ease of reference and clarity.

supervisor of the staff member or department most directly responsible for the complained-of issue. *Id.* at (K)(1). "If the inmate is dissatisfied with the informal complaint response, or the informal complaint process has been waived," the prisoner may then submit a grievance to the inspector of institutional services. *Id.* at (K)(2). After that, if the prisoner is still unsatisfied, he may appeal to the Office of Chief Inspector. *Id.* at (K)(3). Once the Chief Inspector decides the appeal, the prisoner has exhausted his administrative remedies. *Id.* ("The decision of the chief inspector or designee is final."); *see also Perdue v. Morgan*, No. 1:13-cv-878, 2015 WL 1807899, at *3 (S.D. Ohio Apr. 20, 2015), *report and recommendation adopted*, No. 1:13-cv-878, 2015 WL 3852906 (S.D. Ohio June 22, 2015).

A prisoner's administrative filings have substantive requirements, too. Informal complaints and grievances "must contain specific information; dates, times, places, the event giving rise to the complaint and, if applicable the name or names or personnel involved and the name or names of any witnesses." Ohio Admin. Code 5120-9-31(K) (effective from May 1, 2008, to April 4, 2019). If the prisoner does not know the identity of those involved, he may file a "John/Jane Doe" complaint. *Id.* "[D]ates, times, places, physical descriptions of any unidentified personnel and the actions of said personnel giving rise to the complaint," however, are required. *Id.* Similarly, appeals must "contain a clear, concise statement explaining the basis for the appeal." *Id.*

Importantly though, this three-step process does "not serve as an additional or substitute appeal process" for "issues or actions which already include an appeal mechanism beyond the institutional level or where a final decision has been rendered by central office staff." Ohio Admin. Code 5120-9-31(B) (effective from May 1, 2008, to April 4, 2019). In other words, the three-step process applies only to "inmate complaints related to any aspect of institutional life that directly

and personally affects the grievant," including "complaints regarding policies, procedures, conditions of confinement, or the actions of institutional staff." *Id.* at (A). Complaints outside of that scope are still subject to other administrative remedy procedures. *Id.* at (B); (Doc. 43 at 12–13).

Such is the case for religious accommodations. These types of complaints and requests are handled according to ODRC policy 72-REG-02. *See* 2016 Action, No. 2:16-cv-1020 (S.D. Ohio Mar. 20, 2019), Doc. 46-7 (earlier version of 72-REG-02) ("72-REG-02 eff. 2018"). When a prisoner enters a correctional institution, his religious affiliation is noted "at the reception center." 72-REG-02 eff. 2018, at VI.A. But accommodations are not granted based on affiliation alone. *Id.* Instead, to receive a religious accommodation, a prisoner first must request a meeting with the chaplain and a request for religious accommodation form. *Id.* VI.G.1. On the form, the prisoner must list the branch of his religion; the "specific practice, observance, or item requested"; the "basis for the requested religious practice," such as religious writings or traditions; and the "[n]ames of any religious leaders needed to verify the request." *Id.* at VI.G.2. The prisoner then must submit the completed form to the chaplain, who will meet with the prisoner and ask him to explain his views. *Id.* at VI.G.3. The prisoner may also submit additional written materials in support of the request. *Id.* Based upon the information provided, the chaplain will make a recommendation, which is then referred to the institution's Religious Accommodation Review Committee. *Id.* at VI.G.5. The Committee reviews the written request and supporting materials with the chaplain's recommendation. *Id.* at VI.G.6. After the Committee's evaluation is complete, it then recommends an appropriate response to the prisoner's accommodation request. *Id.* at VI.G.7.

23

The process doesn't stop there.  The Committee's recommendation is then forwarded to the managing officer/designee for review.  *Id.* at VI.G.8.  That officer's decision is then sent to the prisoner and the chaplain's office.  *Id.* at VI.G.8.  The tracks diverge based upon the contents of the request.  If the prisoner's accommodation concerns new dietary requests, congregate services, or previously unobserved or not recognized holidays, the managing officer's decision is then sent to the religious services administrator for a final decision.  *Id.* at VI.G.10; *see also id.* at VI.H (discussing the steps the religious services administrator must take to make a decision).  If the accommodation concerns something else, the managing officer's decision is final.  *Id.* at VI.G.9, 10.  A prisoner can appeal a managing officer's final decision to the religious services administrator, but the religious service administrator is the last step.  *Id.* at VI.G.11.

Ultimately, regardless of whether Ohio Administrative Code 5120-9-31 or 72-REG-02 applies, under the PLRA, a prisoner must exhaust the applicable process before filing suit in federal court.  *Williams v. Harris*, No. 1:11-cv-362, 2012 WL 3150955, at *10 (S.D. Ohio Aug. 2, 2012) ("In stating that no action shall be brought until such administrative remedies as are available are exhausted, the plain language of the PLRA makes clear the exhaustion is a mandatory precondition to filing an action in federal court." (citation modified)), *report and recommendation adopted*, No. 1:11-cv-362, 2012 WL 6721088 (S.D. Ohio Dec. 27, 2012).  Not after.  *Hopkins v. Ohio Dep't of Corr.*, 84 F. App'x 526, 527 (6th Cir. 2003) ("Exhaustion may not be completed after a federal complaint has been filed.") (citing *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999)).  If a prisoner files claims in federal court that were not exhausted prior to the suit, those claims should be dismissed without prejudice.  *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 994 (6th Cir. 2004) ("A dismissal under § 1997e should be without prejudice."); *Bell v. Konteh*, 450 F.3d 651, 654–55 (6th Cir. 2006); *Adams v. Smith*, 166 F. App'x 201, 204 (6th Cir. 2006).

b.  *Plaintiff's Exhausted Claims*

Under either mechanism, it appears that Plaintiff did not exhaust his administrative remedies for the claims at issue in this lawsuit.  From January 19, 2018, through January 29, 2023, Defendants aver Plaintiff filed nine grievances related to religious issues.  (Doc. 43 at 15). Defendants provide copies of these grievances, along with a declaration from ODRC Assistant Chief Inspector Uriah Melton, who reviewed the grievances at issue and Plaintiff's institutional record.  (Doc. 43-1 at 1–3 (declaration from Uriah Melton stating she reviewed grievances, electronic institutional communication, and kites), 4–7, 10–12, 13–16, 17–20, 28–31 (exhausted grievances)).  Plaintiff exhausted only five through all three steps.  (Doc. 43 at 15; Doc. 43-1 at 3; *id.* at 4–7, 10–12, 13–16, 17–20, 28–31 (copies of exhausted grievances)).

Plaintiff's exhausted grievances concern the following topics:

1. "[A]n allegedly offensive and inappropriate speech delivered by an unqualified Imam, was fully exhausted by the decision rendered by Eugene Butch Hunyadi of the Office of the Chief Inspector on August 1, 2018" ("Greivance 1").  (Doc. 43 at 16; Doc. 43-1 at 10–12)

2. "[A]n Imam's alleged failure to provide normative contract services due to his lack of conformity to mainstream practices, was fully exhausted by the decision rendered by Eugene Butch Hunyadi of the Office of the Chief Inspector on August 22, 2018" ("Greivance 2").  (Doc. 43 at 16; Doc. 43-1 at 17–20).

3. "ODRC's alleged failure to provide qualified Islamic services providers who are educated in mainstream Muslim rites and know how to conduct valid Jummah services, was fully exhausted by the decision rendered by Eugene Butch Hunyadi of the Office of the Chief Inspector on September 21, 2018" ("Greivance 3").  (Doc. 43 at 16; Doc. 43-1 at 4–7).

4. "[A]n Imam's alleged failure to keep to the contract schedule and provide normative services, was fully exhausted by the decision rendered by Eugene Butch Hunyadi of the Office of the Chief Inspector on September 21, 2018." ("Greivance 4").  (Doc. 43 at 16; Doc. 43-1 at 13–16).

5. "[A] Jummah service that was allegedly interrupted by a noisy program being held in an adjacent room, was fully exhausted by the decision rendered by Marc

Bratton of the Office of the Chief Inspector on March 25, 2020" ("Greivance 5"). (Doc. 43 at 16; Doc. 43-1 at 28–31).

Importantly, only Grievances 1, 2, 3, and 4 arguably relate to Plaintiff's alleged claims in this case. All three could, very generously, be construed as related to Plaintiff's RLUIPA and First Amendment claims, Plaintiff's Eighth Amendment claim, or Plaintiff's Breach of Contract claim. (*Compare* Doc. 4 at 8 *and* Doc. 8 at ¶¶ 6, 12, 34 *and* Doc. 9 at 10–11 *with* Doc. 43-1 at 4–7, 10–12, 13–16, 17–20). None relate to Plaintiff's Equal Protection claim about meals. And even generously construed, Grievance 5—involving one interrupted Jummah service—is not similar enough to Plaintiff's expansive claims in this case for exhaustion purposes. (*Compare* Doc. 43-1 at 28 *with supra* I.B.).

Plaintiff may submit that other attempts to administratively exhaust his claims should be considered. But problems abound. For instance, Plaintiff's Amended Complaint alleges he exhausted his administrative remedies for "relevant grievances" with Annette Chambers-Smith on March 29, 2023; with Mike Davis on March 21, 2023; with Jennifer Urrah on March 16, 2023, and via a religious diet accommodation request on May 4, 2023. (Doc. 8 at ¶ 14; *see, e.g.*, Doc. 43-2 at 3–5; Doc. 43-3 at 100–103). But because each of these were purportedly filed after Plaintiff initiated this case, the Court should not consider any claims at issue in those grievances exhausted for the purposes of this lawsuit. *Hopkins*, 84 F. App'x at 527; *Freeman*, 196 F.3d at 645. Plaintiff may also submit that the religious accommodation requests for kosher or halal meals in 2014, 2015, or 2016 constitute exhaustion for his 2022 meal-related claim. (*See* Doc. 43-2 at 6–15). But, as discussed in more detail below, res judicata bars consideration of those here. Lastly, to the extent that Plaintiff sent letters outlining his litigation efforts, proposing "rational resolutions," or advising the recipient of "a statewide problem," those letters are not proper administrative procedures. *See, e.g.*, Ohio Admin. Code 5120-9-31(K); 72-REG-02; (*see* Doc. 43-3 at 96–99

("Request for Assistance in Islamic Services Complaints" letter sent to Mike Davis in October 2023), 100 ("Notice of informing Jennifer Urrah about religious issues relevant to her departmental mission" letter sent to Mike Davis in March 2023), 101–103 ("Denial of Jummah and Other Islamic Services at most Ohio prisons" letter sent to Jennifer Urrah in March 2023)).

All in all, Plaintiff only arguably exhausted some of his claims.  But even to the extent his claims are wrapped up in the exhausted grievances listed above, there is another wrinkle.  Namely, res judicata.

### 2. Res Judicata

"The doctrine of res judicata . . . provides that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in a prior action." *Pram Nguyen ex rel. U.S. v. City of Cleveland*, 534 F. App'x 445, 451 (6th Cir. 2013) (quoting *In re Alfes*, 709 F.3d 631, 638 (6th Cir. 2013)).  Res judicata is an affirmative defense upon which Defendants bear the burden of proof.  *Neff v. Flagstar Bank, FSB*, 520 F. App'x 232, 327 (6th Cir. 2013) (noting that Federal Rule of Civil Procedure 8(c) lists res judicata as an affirmative defense).  For an action to be barred by the doctrine, four elements must be met:

> (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Pram Nguyen ex rel U.S.*, 534 F. App'x at 451.

In *Lawlor v. National Screen Service Corporation*, the Supreme Court found that even if a subsequent claim involved "essentially the same course of wrongful conduct" as the previous suit, res judicata does not bar claims that did not exist when that action was filed.  349 U.S. 322, 327–28 (1955).  In other words, "a plaintiff [is not] barred from asserting 'new claims based on continuous wrongful conduct, even if that conduct is identical to the subject of a prior suit.'"

*Kalyango v. Ohio Univ.*, No. 2:22-cv-2028, 2023 WL 2499867, at *10 (S.D. Ohio Mar. 14, 2023)

(quoting *Pram Nguyen ex rel. U.S.*, 534 F. App'x at 451).  The Sixth Circuit has explained why

res judicata does not apply in these circumstances:

> Ordinarily, the 'transaction' that gives rise to a cause of action will be clearly delineated.  A car accident victim, for example, must bring all tort claims related to the accident in a single suit or be barred from raising them later.  However, when a plaintiff alleges an ongoing course of harmful conduct, as with a nuisance or pattern of harassment, the task of pinpointing the transaction becomes more challenging.  On the one hand, a plaintiff should not be permitted to repeatedly challenge the same conduct over and over, but neither should a defendant have perpetual immunity from suit based on a single adjudication that may have ended in settlement or a decision in the plaintiff's favor.  A successful plaintiff should not be forever barred from asserting new claims based on continuous wrongful conduct, even if that conduct is identical to the subject of a prior suit.
>
> The solution to this dilemma can be found in the interplay between the doctrines of claim and issue preclusion.  If a plaintiff sues a defendant more than once based on an ongoing course of conduct, the doctrine of claim preclusion will typically not prevent the plaintiff from asserting a cause of action that arose after the first suit was decided.  Because it did not yet exist, such a cause of action literally could not have been brought in the first suit.  However, once a court actually litigates the merits of an issue, the doctrine of issue preclusion will prevent a plaintiff from relitigating the issue in a subsequent suit.

*Pram Nguyen ex rel U.S.*, 534 F. App'x at 451–52.

Further, in determining whether a plaintiff's later allegations are barred by res judicata,

"the crucial date is the date the [prior] complaint was filed."  *Reynolds*, 2018 WL 5928117, at *4

(quoting *Springs v. U.S. Dep't of Treasury*, 567 F. App'x 438, 445 (6th Cir. 2014)); *see also*

*Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834, 840 n.3 (6th Cir. 2000) (rejecting a res

judicata defense because the events underlying plaintiff's claims occurred after the filing of a

previous, related action).  This is because a "plaintiff has no continuing obligation to file

amendments to the complaint to stay abreast of subsequent events; [a] plaintiff may simply bring

a later suit on those later-arising claims."  *Reynolds*, 2018 WL 5928117, at *4 (internal quotation

omitted) (emphasis removed).

Based upon these principles, the Court previously stated that "any claims that Plaintiff had prior to the filing of the amended complaint in his previous suit should have been brought in that action. Plaintiff can, however, pursue claims that arose after that date." (Doc. 30 at 8); *see Ball by Burba v. Kasich*, 244 F.Supp.3d 662, 677 (S.D. Ohio 2017) (finding res judicata did not bar plaintiff's claims because they were based in facts arising after a previous consent decree and the "surrounding regulatory scheme" had changed); *Reynolds*, 2018 WL 5928117, at *5 ("Claims arising from factual events occurring after the filing of a complaint are not barred by *res judicata*."); *Springs*, 567 F. App'x at 445 (finding a claim was not barred by res judicata "because the factual predicate for that claim did not exist" during the earlier suit)." (Doc. 30 at 8; *see also* Doc. 31 (adopting Doc. 30)).

In the 2016 Action, Plaintiff amended his complaint on December 3, 2018. No. 2:16-cv-1020 (S.D. Ohio Dec. 3, 2018), Doc. 30. All exhausted grievances that concern matters raised in this lawsuit, discussed above, should have been brought in the 2016 Action. Each were fully exhausted before December 2018. (*See* Doc. 43-1 at 4–7 (exhausted by a September 21, 2018, decision), 10–12 (exhausted by an August 1, 2018, decision), 13–16 (exhausted by a September 21, 2018, decision); 17–20 (exhausted by an August 22, 2018, decision)). Consequently, each are barred by res judicata.

In sum, there is no evidence in the record that Plaintiff properly exhausted his Equal Protection claim. And even to the extent that the Court could generously construe his exhausted grievances as relating to his RLUIPA, First Amendment, Eighth Amendment, or Breach of Contract claims, those claims are all barred by the doctrine of res judicata. Because Plaintiff has not raised a genuine issue of material fact as to either proposition, the Undersigned

**RECOMMENDS** Defendants be **GRANTED** summary judgment on all of Plaintiff's 2022
Action claims.

> **D.      The 2016 Action Remanded Claims**

Finally, the Court considers Plaintiff's RLUIPA and breach of contract claims from the
consolidated 2016 Action.  (Doc. 54).  As previously noted, the Sixth Circuit remanded these
claims for this Court's consideration.  (2016 Action, Doc. 272).

In their Motion for Summary Judgment, Defendants discuss these claims in a cursory
manner.  (Doc. 43 at 36–38).  But the Court does not read Defendants' limited discussion as
substantive briefing on either of these claims.  Importantly, at the time Defendants filed the Motion,
the 2016 Action had not yet been consolidated with the 2022 Action.  So, all of Defendants points
are made within the confines of their unfulfilled request that the Court not consolidate the two
cases.  (*Id.*).  Even more, Defendants also appear to concede that the Motion for Summary
Judgment at bar is not meant to substantively address Plaintiff's 2016 Action claims.  (Doc. 43 at
38 (noting no schedule has been set for the consideration of Plaintiff's RLUIPA or breach of
contract claims in the 2016 Action)).  For these reasons, the Undersigned declines to grant
summary judgment to Defendants on Plaintiff's remanded 2016 claims based on the record before
the Court.  But this leaves portions of this case unresolved.  And this matter must move forward.

Accordingly, Plaintiff is **ORDERED** to file a notice **limited in scope** to whether he wishes
to still pursue his 2016 RLUIPA and breach of contract claims, either in whole or in part.  Plaintiff
must file the notice **within twenty-one (21) days of the date of this Order**.  The Court will not
grant Plaintiff additional time.  Plaintiff is **WARNED** that the Court will not consider any parts of
his forthcoming notice that respond beyond the Court's narrow question.  Plaintiff is **further**

**WARNED** that failure to file this notice could result in his 2016 claims being dismissed for failure to prosecute.

If Plaintiff chooses to pursue the remanded RLUIPA and breach of contract claims, the Court **SETS** the following deadlines:

- Dispositive motions due                    November 21, 2025

- Responses due                              December 11, 2025

- Replies due                                January 7, 2026

The Court will not grant extensions to these deadlines absent extenuating circumstances.

## IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Rule 56(d) Motion (Doc. 44), **DENIES as moot** his Motion to File Interrogatories *Instanter* (Doc. 46), and **DENIES** his Request for Additional Time to Respond to Defendants' Motion for Summary Judgment (Doc. 44). The Undersigned further **RECOMMENDS GRANTING** Defendants' Motion for Summary Judgment (Doc. 43). Finally, the Court **ORDERS** Plaintiff to provide the notice detailed herein regarding his remanded 2016 claims **within twenty-one (21) days** and **SETS** a related briefing schedule.

IT IS SO ORDERED.

Date:  September 25, 2025                    /s/ Kimberly A. Jolson
                                            KIMBERLY A. JOLSON
                                            UNITED STATES MAGISTRATE JUDGE

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s).  A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo* and operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).