**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KEVIN A. TOLLIVER,**

    **Plaintiff,**

    **v.**

**OHIO DEPARTMENT OF REHABILITATION
AND CORRECTIONS,** *et al.,*

    **Defendants.**

**Civil Action 2:22-cv-4567
Judge Edmund A. Sargus, Jr.
Magistrate Judge Kimberly A. Jolson**

## <u>ORDER AND REPORT AND RECOMMENDATION</u>

Defendants' Motion for Summary Judgment (Doc. 69), Plaintiff's Motion for Summary Judgment (Doc. 70), and Plaintiff's Motion to Strike and for Leave to File an Amended Motion for Summary Judgment (Doc. 71) are before the Court.  For the following reasons, the Court **GRANTS** Plaintiff's Motion to Strike (Doc. 71) and **STRIKES** his Motion for Summary Judgment (Doc. 70).  The Court further **GRANTS** him leave to file an amended motion for summary judgment instanter (Doc. 71).  That said, the Undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment (Doc. 69) be **GRANTED**, and Plaintiff's Amended Motion for Summary Judgment (Doc. 71-1) be **DENIED**.  Finally, to the extent Plaintiff asks for leave to amend the operative complaint, the Court **DENIES** that request.

## I.    BACKGROUND

Plaintiff, an Ohio prisoner at Grafton Correctional Institution ("GCI") proceeding *pro se*, is a frequent litigator in this District.  (*See* Doc. 30 at 1 (listing Plaintiff's cases)).  Because the Court consolidated two of Plaintiff's cases into this action (*see* Doc. 54), the Court briefly describes the allegations and procedural history of both.

## A.    The 2016 and 2022 Actions

In 2016, Plaintiff filed a case in this Court against the Ohio Department of Rehabilitation and Correction ("ODRC") employees, including Warden Jeffery Noble, ODRC's Regional Director Robert Jeffries, Religious Services Administrator Mike Davis, Deputy Warden of Operations Major Taylor, Deputy Warden of Special Services Moore, Chief Inspector Hunyadi, two chaplains, two religious services contractors, two inspectors, and John and Jane Doe ODRC staff. *Tolliver v. Noble, et al.* (the "2016 Action"), No. 2:16-cv-1020 (S.D. Ohio Oct. 25, 2016), Docs. 1, 30.  In the operative complaint, Plaintiff raised claims under 42 U.S.C. § 1983; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.*; and state law based upon alleged issues with Islamic service providers and incidents of retaliation at various Ohio prisons. *Id.* at Doc. 30 (Amended Complaint).

During the 2016 Action, Plaintiff amended his pleading once, though he tried to do so again on many occasions. *Id.*; *see also* Docs. 93, 100, 153, 164, 165, 166, 167 (Plaintiff's various amendment attempts).  When those efforts failed, Plaintiff filed another case on December 29, 2022 (the "2022 Action").  *Id.* at Doc. 208; (*see also* Doc. 1; Doc. 54 at 6 ("Because the court rejected these [amendment] attempts Plaintiff filed an Original Action in Declaratory Judgment before the same judge and magistrate.  It is the causal religious issue proceeding as *Tolliver v. Annette Chambers Smith* (S.D. Ohio Case No. 2[2]-cv-4567)[.]"))).

In the 2022 Action, Plaintiff sued Defendants ODRC, ODRC Director Annette Chambers-Smith, Chief of Religious Services Mike Davis, Chief of Holistic Services Jennifer Urrah, and unidentified Jane and John Doe Administrators and Islamic Services Contractors.  (Doc. 4 at 30; Doc. 9 at 10–11; Doc. 14 (adopting Docs. 4, 9)).  He described this action "as a direct challenge to practices and policies of the [ODRC]."  (Doc. 4 at 4).  The Court allowed him to proceed against

2

ODRC under RLUIPA and against Chambers-Smith, Davis, Urrah, and the unidentified Doe Defendants under RLUIPA, Section 1983, and state contract law.  (Doc. 9 at 11).

B.  **Procedural History of Both Cases**

For nearly three years, the 2016 and 2022 Actions proceeded simultaneously.  In the 2016 Action, the Court dismissed all Defendants besides Christler, Sibalski, Shahid, and Islam on the pleadings and eventually granted summary judgment in favor of Defendants Christler, Sibalski, and Islam.  *See* 2016 Action, No. 2:16-cv-1020 (S.D. Ohio), Doc. 117 at 6; Docs. 172, 183. Plaintiff received a judgment at trial against Defendant Shahid.  *Id.* at Doc. 258.  On December 18, 2023, Plaintiff appealed these decisions to the Sixth Circuit.  *Id.* at Doc. 261.

Meanwhile the pleading stage of the 2022 Action lasted almost two years.  (*Compare* Doc. 1 (original complaint filed December 29, 2022) *and* Doc. 8 (amended complaint filed June 1, 2023) *with* Docs. 30, 31 (denying Defendants' motion to dismiss) *and* Doc. 32 (Defendants' answer, filed on October 23, 2024)).

Then, on November 11, 2024, the Sixth Circuit ruled on Plaintiff's appeal of the 2016 Action.  2016 Action, No. 2:16-cv-1020 (S.D. Ohio Nov. 15, 2024), Doc. 272.  While the panel mostly affirmed the Court's judgment, it concluded that the Court "did not decide [Plaintiff's] RLUIPA claim and related breach-of-contract claim" and remanded for the Court to consider Plaintiff's request "to have these claims consolidated with his separate, similar lawsuit." *Id.*

In July 2025, Defendants filed a motion for summary judgment in the 2022 Action.  (Doc. 43).  The next month, the Court consolidated the remanded RLUIPA and breach-of-contract claims from the 2016 Action with the 2022 Action, noting that Plaintiff asserted that these claims were proceeding in the 2022 Action all along.  (Doc. 54 at 6 (discussing Plaintiff's representation to the Sixth Circuit "that he filed the 2022 Action to ensure those claims would be adjudicated")).

3

In September, the Undersigned recommended that the Court grant Defendant's motion for summary judgment as for the 2022 Action claims. (Doc. 56). That recommendation remains under the District Judge's consideration. Important here, in attending to the motion for summary judgment, the Court considered the remanded claims from the 2016 Action. The Court found that because Defendants filed the summary judgment motion before the Court consolidated the 2016 and 2022 Actions, Defendants had not substantively addressed the remanded claims. (Doc. 56 at 30 (also noting that Defendants appeared to concede that the motion was not meant to address the remanded claims)). For this reason, the Court set a deadline for the parties to file dispositive motions on Plaintiff's remanded RLUIPA and breach of contract claims. (*Id.*). Both sides took advantage—with Plaintiff also filing a request to file an amended motion—and these matters are ready for review. (Docs. 69, 70, 71, 72, 73, 75, 76).

## II.     STANDARD

A court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Ultimately, the Court asks "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## III. DISCUSSION

Before considering the merits of the parties' summary judgment motions, the Undersigned must first address two threshold matters.

### A. Plaintiff's Motion to Strike and Amended Motion for Summary Judgment

To begin, the Court set the parties' deadline to file dispositive motions to November 21, 2025. Plaintiff posted his original Motion for Summary Judgment on that day. (Doc. 70 at 25); *see Lloyd v. Mohr*, No. 2:13-CV-1158, 2014 WL 934647, at *7 (S.D. Ohio Mar. 10, 2014) (noting the prison mailbox rule "provides that the filing of a legal document by a prison inmate is deemed to be timely if it is delivered to the institution's internal mail system on or before the last day for filing") (citation omitted). Then five days later, Plaintiff posted another Motion, asking the Court to strike his first summary judgment motion and to allow him to amend it. (Doc. 71; *see also* Doc. 71-1 (amended motion for summary judgment)). As support, Plaintiff attests that he experienced technological problems at his institution's law library causing the omission of several exhibits from his original motion. (*Id.*). The Court received all these filings in the mail on the same day, December 2.

Although Plaintiff has a history of providing excuses for why he cannot follow case deadlines (*see* Doc. 56 at 16–20), the Court finds that in this instance, there is little harm in allowing him to amend his summary judgment motion. Defendants do not appear to oppose his request, and they substantively responded to the amended motion. (*See* Doc. 72 (generally citing to the amended motion rather than the original motion)). Accordingly, the Court **GRANTS**

Plaintiff's Motion to Strike his first motion for summary judgment and **GRANTS** him leave to file an amended motion for summary judgment.  (Doc 71).

### B.    Claims at Issue

The second threshold matter the Undersigned must address is what claims must be considered on summary judgment.  As noted above, when the Sixth Circuit ruled on Plaintiff's appeal of the 2016 Action, the panel provided contours for what this Court must consider on remand.  2016 Action, No. 2:16-cv-1020 (S.D. Ohio Nov. 15, 2024), Doc. 272.  Specifically, the panel remanded "for further proceedings on [Plaintiff's] RLUIPA and breach-of-contract claims." *Id.*  Despite this unambiguous order, Plaintiff's Amended Motion for Summary Judgment attempts to add other constitutional claims.  (*See, e.g.*, Doc. 71-1 at 5 (stating the Court did not resolve a "denial of access to court" claim), 19 (requesting summary judgment on "Equal Protection" and "Establishment Clause" claims); *see also* Doc. 73 at 15–16 (arguing the same)).  Plaintiff asserts the Court must consider them here because the claims are "inextricably intertwined" with his RLUIPA claim.  (*Id.* at 19).  And, because of his *pro se* status, the Court should read constitutional claims into his RLUIPA allegations.  (Doc. 76 at 4–5).

The Undersigned disagrees.  The Sixth Circuit tasked this Court with addressing Plaintiff's RLUIPA and breach of contract claims as presented in the 2016 Action's Amended Complaint only.  The Undersigned rejects his attempts at expansion at this late hour.  And the Undersigned will not devote time to Plaintiff's arguments unrelated to RLUIPA or breach of contract.  With that framework in mind, the Undersigned addresses Defendants' Motion for Summary Judgment and Plaintiff's Amended Motion for Summary Judgment concurrently.

6

## C.     Breach of Contract

The thrust of Plaintiff's breach of contract claim is that while Plaintiff was incarcerated at Madison Correctional Institute ("MaCI") and Pickaway Correctional Institute ("PCI"), Islamic religious contractors did not properly conduct Jumah[1] prayer services every Friday.  2016 Action, No. 2:16-cv-1020, Doc. 30 at ¶¶ 16–31.  He alleges that the services were generally either "not provided" or "not timely."  *Id.* at ¶ 19.  He also complains that when the services happened, the contractors "did not conform to the minimum necessary standards to be considered a religiously valid Jumah service."  *Id.* at ¶¶ 20–22.  He further alleges that the contractors did not properly instruct Taleem classes and were generally unqualified to perform the services for which they were contracted.  *Id.* at ¶¶ 27–28; *see also id.* at ¶¶ 23–24 (stating these "failures" were caused by Defendants not hiring enough contractors, not hiring qualified contractors, and not hiring contractors who serve the "mainstream" Muslim).  He asserts the breaches of contract resulted in his denial of religious services, and "as a third-party recipient, Plaintiff has just cause to complain" under the contract.  *Id.* at ¶ 32 (cleaned up).  All involved understand these allegations to raise a third-party breach of contract claim.  (*See* Docs. 69 at 10–11; Doc. 71-1 at 19–20).

"To succeed on a breach of contract claim under Ohio law, a plaintiff must establish the 'existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.'"  *Rutherlan Enters., Inc. v. Zettler Hardware*, 60 F. Supp. 3d 828, 836 (S.D. Ohio 2014) (citing *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio 1994)).  "[O]nly a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract."  *Grant Thornton v. Windsor House, Inc.*, 566 N.E.2d 1220, 1223 (Ohio 1991) (citation omitted).  Ohio courts have adopted the Restatement (Second) of Contracts, § 302 in distinguishing between the types of

---

[1] There is inconsistency in the record as to the proper spelling of this prayer service.  The Undersigned will generally conform to how Plaintiff most often spells it: "Jumah."

7

beneficiaries:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> > (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> >
> > (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 855 (6th Cir. 2020) (citing *Hill v. Sonitrol of SW Ohio, Inc.*, 521 N.E.2d 780, 784 (Ohio 1988)).  "Third parties that are only incidental beneficiaries are generally not permitted to assert claims under contracts to which they are not parties."  *Id.* at 856 (citing *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980)).

To find that a third party was an intended beneficiary to an agreement, "there must be evidence that the contract was intended to directly benefit that third party."  *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio 2011); *see also In re Nat'l Century Fin. Enters., Inc.*, 377 F. App'x 531, 540 (6th Cir. 2010) ("Under Ohio law, for a third-party beneficiary to be an intended beneficiary, the contract must have been entered into by the parties *directly or primarily* for the benefit of that person." (citation omitted)); *TRINOVA Corp. v. Pilkington Bros.*, 638 N.E.2d 572, 577 (Ohio 1994) ("There must be evidence that the promisee assumed a duty to the third party."). Importantly, "the mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient [to establish the party is an intended beneficiary]; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary."  *Norfolk & W. Co.*, 641 F.2d at 1208 (citation omitted).  The language of the contract is the best measure of the parties' intent in this respect.  *In re Nat'l Century Fin. Enters.,*

8

*Inc.*, 377 F. App'x at 540.

Here, Plaintiff argues that he was an intended beneficiary of contracts between ODRC and Islamic service providers because the "religious services contracted for by ODRC were specifically meant to be received by incarcerated Muslims." (Doc. 73 at 9; *see also* Docs. 71-1 at 20 ("Plaintiff Tolliver was meant to be a recipient to the contracts between the Islamis Services Providers and ODRC."); Doc. 76 at 4).

To begin, a religious services contract is a contract between an Imam and the government. (*Cf.* Doc. 72-2 at 61–67 ("This Contract is entered into between the Ohio Department of Rehabilitation and Correction . . . and the named Independent Contractor)). This means Plaintiff faces a higher threshold before he can sue to enforce it. "[U]nder Ohio law, private citizens—even if third-party beneficiaries—do not have 'the right to enforce government contracts on their own behalf, unless a different intention is 'clearly manifested' in the contract.'" *Shelly & Sands, Inc. v. Dement*, No. 2:22-CV-4144, 2024 WL 199625, at *4 (S.D. Ohio Jan. 18, 2024) (quoting *Walker v. Jefferson Cty.*, 2003 WL 21505472, at *7 (Ohio Ct. App. June 25, 2003)); *see also State ex rel. Atty. Gen. v. Mastergard*, 60 N.E.3d 540, 546 (Ohio Ct. App 2016) (noting the general contract principle "that third party beneficiaries of a government contract generally are assumed to be merely incidental beneficiaries, and may not enforce the contract absent clear intent to the contrary" (citation omitted)). Said differently, "Ohio presumes that third-party beneficiaries of government contracts are incidental, not intended, beneficiaries, unless the language of the contract clearly states otherwise." *Brickman v. Maximus, Inc.*, No. 2:21-CV-3822, 2022 WL 16836186, at *8 (S.D. Ohio May 2, 2022).

Plaintiff has provided no evidence that any religious services contract was intended to benefit him directly, let alone shown a "clear" manifestation of that intent. He simply repeats his

supposition that as a Muslim inmate, he is a "direct benefactor of the [religious] services." (*See, e.g.*, Doc. 73 at 9). This is not enough. *Cf. Duncan v. Cuyahoga Cmty. Coll.*, 29 N.E.3d 289 (Ohio Ct. App. 2015) (finding a police department employee who attended a training program was not an intended beneficiary of a contract between a community college and the training program); *Santagate v. Penn. Higher Educ. Assistance Agency*, 2020 WL 2850264, at *5 (Ohio Ct. App. 2020) (finding a student was not an intended beneficiary of a services agreement between the Department of Education and a student loan servicer). Notably, Plaintiff has not offered contract language showing he specifically "[has] the right to sue to enforce" the government contract, as is required here. *Shelly & Sands, Inc.*, 2024 WL 199625, at *4.; *see Fifth Third Bank v. Cope*, 835 N.E.2d 779, 848 (Ohio Ct. App. 2005) (finding a homeowner was not a third-party beneficiary to enforce a contract between an inspector and a city because while the contract obligated the inspector to provide services to the "community at large" it did not obligate services to "any specific individual[]" like the plaintiff).

On this note, courts in Ohio are clear that to determine whether a government contract manifests an intent that a private citizen could enforce it, the Court "must be able to view and interpret" the contract. *Walker*, 2003 WL 21505472, at *7. But the Court does not appear to have any contract at issue in Plaintiff's Amended Complaint before it. The only "contract" Plaintiff cites to is an exhibit attached to Defendant's prior summary judgment motion. (*See* Doc. 73 at 10 (citing Doc. 43-3); Doc. 71-1 at 20 (same)). The exhibit includes (1) a declaration of ODRC religious services administrator Dr. Mike Davis that describes the religious service contractor position and provides "ODRC's scope of work specifically requires Muslim contractors to . . . conduct weekly Jummah services [and] conduct Taaleem classes[.]"; (2) a job notice for GCI

10

seeking an Islamic service contractor that describes the scope of service to be provided;[2] (3) an unsigned 2024 contract between ODRC and independent contractor Imam Nordeene Allooh for work at GCI; and (4) a job notice for Mansfield Correction Institution seeking an Islamic contract chaplain that describes the duties to be performed.  (Doc. 43-3 at 2–4, 58–59, 60–66, 83–84; *see also* Doc. 75-1 (declaration of Imam Allooh discussing his current contract)).  None of these documents is an Islamic services contract that would have been in effect before Plaintiff filed the 2016 Action.  Consequently, the Undersigned cannot evaluate under the plain language of any applicable contract whether there existed a clear manifestation that Plaintiff specifically was an intended beneficiary.  *See also Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) ("It is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." (citation and internal quotation marks omitted)).

And there is more.  Even if the Undersigned were to assume that Plaintiff could sue under an Islamic services contract—which he can't—and that contract mirrored the language contained in Imam Allooh's contract—a mere possibility—Plaintiff still has not raised a genuine issue of material fact that the contract was breached.  (*See* Doc. 75 at 8–9).

Reading the record generously, Plaintiff premises a breach of contract on the religious providers "denying [him] services" by (1) not holding Jumah prayer services every week; (2) not properly performing the Jumah services; (3) not properly instructing Taleem; and (3) not purchasing new materials and books.  (*See, e.g.*, Doc. 73 at 9 ("The denied Jumah was a breach of promised performance."), 10 (referencing "multiple declarations proving Jumuah was regularly not being performed and when it was said rites and rituals did not occur"), 35 (undated declaration

---

[2] While Plaintiff directs the Court to the "plain language of the contract," he actually cites to this document.  (*See* Doc. 73 at 10).

of Khaleel Shabazz stating "Muslim inmates are often denied Jumah services"), 36 (undated declaration of Richard Thomas stating "Muslim inmates are often denied Jumah services"), 38 (undated affidavit of Kenneth W. Hopkins stating "Muslim inmates are often denied Jumah services"), 51 (May 2023 declaration of Keith Mustin stating he has complaints of "repeated denial of Jummuah"); 52 (May 2023 declaration of Devon Hubbard referencing "denied Jummuah services"); 54 (November 2020 affidavit of Plaintiff stating he has been "denied . . . "Jummuah and Taleem on hundreds of occasions"); Doc. 71-1 at 20 (contending the "preferred contractors were not providing Jumah under the contracting scheme"); Doc. 76 at 4, ("The denied Jumah on hundreds of occasions [is] a breach of promised performance."), 6 (referencing "multiple declarations proving Jumah was regularly not being performed and when it was said rites and rituals did not occur")); 2016 Action, No. 2:16-cv-1020, Doc. 30 at ¶¶ 19 (attesting that Jumah services "were either not being provided, or when they were attempted were not timely"), 20 (stating when Jumah services were held, the contractor "did not conform to the minimum necessary standards to be considered a religiously valid Jumah service pursuant to the criteria required by normative/mainstream Islamic communities worldwide"), 28 (declaring the contractors "cannot, or will not, properly instruct [T]aleem classes due to their basic lack of knowledge and/or respect for the mainstream doctrines and materials . . . [they] also fail to use existing budgets to purchase materials and books"). Under the plain language of Imam Allooh's contract, none of these actions, by themselves or together, would constitute a breach.

Under the "services or supplies" contract provision, "[t]he Contract Chaplain will conduct primary worship of the Islamic faith weekly . . . Weekly congregated activities include Jumuah Prayer and/or Zuhr Prayer." (Doc. 43-3 at 61; *see also id.* (stating the duties of the contractor may include "conduct[ing], supervis[ing], and/or provid[ing] weekly congregate activities such as

12

Jumuah Prayer, Zuhr Prayer and/or Taleem")).  In other words, the religious services provider is not required to facilitate weekly Jummah prayer.  Rather, the term "and/or" signifies that, as long as the provider conducts Zuhr prayer, there is no requirement that he must also conduct Jumah prayer.  A "denied" Jumah prayer service alone is not a breach of the contract.  And that is all Plaintiff has supported here.  Additionally, while the provider shall provide "religious education and/or instruction classes (Taleem)," the contract is silent as to what that educational experience should include, how often the instruction should happen, or what materials the provider must offer. (*Id.*).  The contract is similarly silent as to how the provider must conduct Jumah prayer when it happens.  (*Id.*).  Plaintiff's related allegations, then, do not constitute breach either.

In sum, Plaintiff has had nearly ten years to discover and produce the contract under which he is suing.  He did not do so.  The Undersigned cannot evaluate the language of the contract to determine if Plaintiff may sue under it.  Nor has he provided anything else—aside from his own conclusory assertions—supporting that a religious services contract executed prior to his suit in 2016 included a clear manifestation of an intent to benefit him.  And, even if the Undersigned assumes he is an intended beneficiary and looks to a contract that is possibly the same, Plaintiff has not raised a genuine issue of material fact as to breach.  For these many reasons, the Undersigned **RECOMMENDS** that the Court **GRANT** Defendants summary judgment on Plaintiff's breach of contract claim and **DENY** Plaintiff summary judgment on the same.

### D.     RLUIPA

RLUIPA prohibits a government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling

governmental interest." 42 U.S.C. § 2000cc-1(a).  Under RLUIPA, a "religious exercise" is "any

exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42

U.S.C. § 2000cc-5(7)(A).

The Sixth Circuit has summarized the burden-shifting framework for a prisoner asserting

a RLUIPA claim:

> The prisoner bears the initial burden. She must show (1) her desired religious
> exercise is motivated by a "sincerely held religious belief" and (2) the government
> is substantially burdening that religious exercise. *Cavin v. Mich. Dep't of Corr.*,
> 927 F.3d 455, 458 (6th Cir. 2019). If the prisoner successfully shows the state
> substantially burdens a sincere religious belief, the burden shifts to the government
> to justify the burden on the religious adherent under the "daunting compelling
> interest and least-restrictive-means test," with a slight twist. *Id.* Courts must give
> "due deference to the experience and expertise of prison and jail administrators in
> establishing necessary regulations and procedures to maintain good order, security
> and discipline, consistent with consideration of costs and limited resources." *Cutter
> v. Wilkinson*, 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

*Ackerman v. Washington*, 16 F.4th 170, 179–180 (6th Cir. 2021); *see also Livingston Christian

Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1001 (6th Cir. 2017) (noting the substantial burden

inquiry and the question of whether the government's interest is compelling are questions of law).

As noted above, Plaintiff's summary judgment briefing attempts to expand this claim to

include all sorts of legal theories and factual allegations.  Consequently, the Undersigned must

take time to define the contours of Plaintiff's RLUIPA claim, as told by his Amended Complaint.

2016 Action, No. 2:16-cv-1020, Doc. 30 at ¶¶ 33–56.  There, Plaintiff begins by detailing his

various complaints about the religious contractors' actions during his time at MaCI and PCI.  *Id.*

at ¶¶ 34–35.  Presumably, these actions are the same as those at issue in his breach of contract

claim:  Missed or inadequate Jumuh services and Taleem classes.  *Id.* at 33 (stating for his RLUIPA

claim "Plaintiff reiterates the facts from [the breach of contract claim] as if rewritten).  Plaintiff

also asserts that when prayer services happened, the contractors perpetuated ideology that

14

"denigrated Muslims from mainstream communities" and "did not conform to the minimum standards" of the services "pursuant to the criteria required by normative/mainstream Islamic communities worldwide." *Id.* at ¶¶ 21–22.  When he transferred to London Correctional Institution ("LoCI") in 2016, Plaintiff alleges he was warned by inmates that the religious services contractor conducted services in such a way that most mainstream Muslim inmates did not attend. *Id.* at ¶ 43; *see also id.* at ¶ 49 (alleging certain services were "not valid" according to "mainstream Muslims").

Plaintiff alleges that Defendants hired these contractors to "keep the numbers of Muslims who use chapel services down and . . . create[] more opportunities to conserve resources for Christian services." *Id.* at ¶ 50.  Plaintiff also provides some examples of Defendants' "preference for Christianity over Islam." *Id.* at ¶ 53 (stating the contractors do not order lamb meat for Eid al-Adha; they deny "coordination of Islamic prayer during Ramadan," forcing inmates to choose between eating a religious meal or attending a religious prayer services; they do not recite "Kutba al-Hijr" in Arabic during Jumah services; and they do not accept certain book donations).

Plaintiff attributes the "denial of [his] rights" to "ODRC Policies 72 REG 01 through 12" because they are "ineffective as applied to Islam." *Id.* at ¶ 54.  Specifically, the policies do not: (1) differentiate between "Islam's main body (the Sunni school), Shia, and . . . the Nation of Islam"; (2) define "mainstream" or "broadest spectrum of the faith"; or (3) outline steps that must be completed for rites and rituals. *Id.* at ¶ 54 (cleaned up).  He also says the policies violate RLUIPA because they "create[] conditions favorable to abuse by contractors, administrators, and staff." *Id.* at ¶ 55.  And he says his RLUIPA claim challenges "the methods of screening and hiring [Islamic religious] contractors." *Id.* at 62.  Plaintiff states he brings this claim against Defendants in their official capacities for injunctive relief and their individual capacities for damages. *Id.* at ¶ 12; *see*

*also id.* at 30 (stating for his RLUIPA claim he seeks "[a]ppropriate corrective injunctive relief, declaratory judgment, and any appropriate relief determined by the court").

### 1.    *Permissible Relief*

To begin, the Undersigned considers what relief RLUIPA offers Plaintiff.  The Sixth Circuit is clear that monetary relief is not available under RLUIPA.  *Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("[T]he Eleventh Amendment bars [a] plaintiff's claim for monetary relief under RLUIPA."); *Haight v. Thompson*, 763 F.3d 554, 570 (6th Cir. 2014) ("RLUIPA does not permit money damages against state prison officials, even when the lawsuit targets the defendants in their individual capacities.").  Nor does RLUIPA "create a cause of action against an individual in that individual's personal capacity."  *Carnahan v. Adamson*, No. 1:24-CV-809, 2025 WL 793081, at *5 (W.D. Mich. Mar. 13, 2025) (citation omitted).

The Undersigned notes that the question of whether an individual may sue a government official in his individual capacity for damages for a violation of RLUIPA is currently being before the Supreme Court of the United States.  *See Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 145 S. Ct. 2814 (2025) (granting petition for writ of certiorari); *see also* Oral Argument, *Landor v. Louisiana Dep't of Corr. & Pub. Safety* (2025) (No. 23-1197), https://www.oyez.org/cases/2025/23-1197.  But, at this moment, the Sixth Circuit says no.  *See, e.g.*, *Haight*, 763 F.3d at 570.  And this Court is held to existing precedent.  Thus, the Undersigned **RECOMMENDS** that Defendants be **GRANTED** summary judgment on Plaintiff's RLUIPA claims against them in their individual capacities and to the extent Plaintiff seeks monetary damages.  In that same vein, Plaintiff's summary judgment requests for the same are **RECOMMENDED** to be **DENIED**.

16

Plaintiff's official capacity RLUIPA claim is different.  Generally, "an official capacity suit against a state official is deemed to be a suit against the state and is thus barred by the Eleventh Amendment, absent a waiver." *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (quoting *Cady v. Arenac County*, 574 F.3d 334, 344 (6th Cir. 2009)).  "But when plaintiffs seek an injunction to prevent prospective violations of federal law, the state's sovereign immunity does not shield its officers." *Ladd v. Marchbanks*, 971 F.3d 574 (6th Cir. 2020).  In other words, a plaintiff "may seek prospective injunctive relief against state officials in their official capacity before those officials violate the plaintiff's federal constitutional or statutory rights." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 733 (6th Cir. 2022) (citing *Ex parte Young*, 209 U.S. 123 (1908)).  "Past exposure to an isolated incident of illegal conduct does not, in itself, sufficiently prove that the plaintiff will be subjected to the illegal conduct again." *Carnahan*, 2025 WL 793081, at *6 (citing *Los Angeles v. Lyons*, 461 U.S. 95 (1983)).  A complaint must allege an "ongoing violation of federal law and seek[] relief properly characterized as prospective." *Ladd*, 971 F.3d at 581 (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).  Additionally, "the officer named in the suit must have 'some connection with the enforcement of the act.'" *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662 (S.D. Ohio 2017) (quoting *Ex parte Young,* 209 U.S. at 157)); *see also Doe v. DeWine*, 910 F.3d 842 (6th Cir. 2018) (noting that under *Ex parte Young*, a defendant must be "actively involved with administering" a challenged statute).  These principles present challenges for Plaintiff's RLUIPA claim, which are best understood in several parts.

2.  *Plaintiff's RLUIPA Challenge to Actions at MaCI, PCI, and LoCI*

For the vast majority of Plaintiff's RLUIPA claim, he seeks non-prospective relief. Currently, Plaintiff is incarcerated at Grafton Correctional Institution.  Plaintiff's Amended Complaint discusses actions specific contractors took—or did not take—at MaCI, PCI, and LoCI.

17

*See generally* 2016 Action, No. 2:16-cv-1020, Doc. 30.  On past occasions, the contractors did not hold proper Jumah services; did not conduct proper Taleem classes; did not generally teach mainstream Muslim ideology; did not purchase or accept books; retaliated against Plaintiff for his complaints; did not purchase religious food; and did not coordinate prayer during Ramadan in a way that also allowed him to eat the Iftar evening meal.  *Id.* at ¶¶ 19, 20, 21, 28, 35, 53.  What Plaintiff's Amended Complaint does not allege is that the contractors named in his 2016 Action continued to take similar actions once he transferred to GCI.  (*See generally* Doc. 30).  He does not state as much in his summary judgment briefing.  (*See* Doc. 73 at 2 (stating only that a contractor not named in his 2016 Action Amended Complaint "denies" services at GCI), Doc. 76 at 9 (same)).  And the record is devoid of any suggestion that the relevant contractors currently work at GCI.  In fact, the opposite appears to be true.  (*See* Doc. 72-2 at 1 (declaration of Mike Davis stating that one of the contractors Plaintiff complains of did not receive a renewed contract at LoCI and the other holds a religious services contract at Belmont Correctional Institution)).

At base, Plaintiff seeks retrospective relief rather than prospective relief insomuch as he wishes the Court to address the discrete behavior of contractors at his prior institutions.  Even if all of Plaintiff's allegations are true, they are over and done.  He is at a new institution and is led by new Islamic religious contractors.  By virtue of his transfer, then, Plaintiff's claim is moot.  *See, e.g.*, *Heyward v. Cooper*, 88 F.4th 648, 656–67 (6th Cir. 2023) (dismissing an RLUIPA claim because the plaintiff did not allege a present or future injury and additionally finding the claim moot where the plaintiff was transferred to a different facility and his requests were directed at certain officials rather than ODRC programs "as a whole"); *El Bey v. Kehr*, No. 23-3505, 2024 WL 2977543, at *2 (6th Cir. Jan. 29, 2024) (finding a claim moot where the plaintiff transferred institutions and did not show that the defendants at issue violated his rights under RLUIPA after

the transfer); *Mease v. Washington*, No. 2:20-CV-176, 2021 WL 1921071, at \*12  (W.D. Mich. May 13, 2021) (dismissing an RLUIPA claim where the plaintiff alleged only "two discrete incidents and makes no allegation about a continuing violation of his rights"); *Pleasant-Bey v. Tennessee Dep't of Correction*, No. 215CV00174RLJCRW, 2020 WL 5791789, at \*12 (E.D. Tenn. Sept. 28, 2020) (finding an RLUIPA claim moot because the plaintiff challenged food services practices by specific employees at a prior institution rather than challenging a policy as a whole); *cf. Kensu v. Haigh*, 87 F.3d 172 (6th Cir. 1996) (finding moot a First Amendment challenge because the plaintiff was no longer held at the prison that searched his mail).

Similarly, to the extent Plaintiff's Amended Complaint alleges RLUIPA violations connected to the "screening," hiring, or allocation of the named contractors, those allegations also encompass past, discrete actions for which the Court cannot offer prospective relief.  *Cf. Heyward v. Cooper*, 88 F.4th 648, 656 (6th Cir. 2023) ("'Without a time machine, we cannot go back' and fix alleged wrongs[.]" (quoting *Thompson v. DeWine*, 7 F.4th 521, 524 (6th Cir. 2021)).  RLUIPA offers him no remedy there either.

### 3. *Plaintiff's RLUIPA Challenge to Actions at GCI*

Moving onto any conceivable challenge to actions at Plaintiff's current institution.  As noted, Plaintiff has not alleged that the Defendants named in his 2016 Action have continued violating his rights under RLUIPA following his transfer to GCI.  Nor did Plaintiff attempt to amend his 2016 Action pleading to include allegations related to conduct at GCI.  *See, e.g.*, 2016 Action, No. 2:16-cv-1020, Doc. 84 (asking to amend to more sufficiently allege Defendants' personal involvement), Doc. 93 (seeking to amend to provide "more information" about religious contractors), Doc. 100 (proposed amendment that does not mention conduct at GCI and "deals

with the period" prior to when Plaintiff notified the Court of his transfer there), Doc. 165 (struck proposed amendment that does not mention conduct at GCI)).

Still, Plaintiff contends his problems are equal at GCI. (*See, e.g.*, Doc. 76 at 9). But there are problems with his allegations. He provides a few declarations of GCI inmates who say the Jumah services "are often denied," but none attests that any contractor in Plaintiff's Amended Complaint personally denies services at GCI or otherwise provides specifics about lack of services. (*See, e.g.*, Doc. 73 at 35, 36, 37, 50 (unsigned or illegible signature), 51, 52). Additionally, GCI's current Islamic services contractor is Imam Nordeene Allooh. (Doc. 75-1 at 1). He is not a party to this lawsuit. Nor does it appear Plaintiff timely exhausted any grievances that implicate his RLUIPA rights at GCI. (*See* Doc. 69-1 at 2–3, 4–63; *see also* Doc. 56 at 21–24 (the Undersigned's in-depth discussion of administrative exhaustion requirements)).

More fundamentally, though, Plaintiff's framing is awkward. While Defendants do not appear to challenge the sincerity of Plaintiff's religious beliefs, the bedrock of Plaintiff's second showing under RLUIPA is whether the government has substantially burdened an inmate's religious practice. "[T]he Government substantially burdens an exercise of religion" under RLUIPA "when it 'places substantial pressure on an adherent to modify his behavior and to violate his beliefs or effectively bars his sincere faith-based conduct.'" *Ackerman v. Washington*, 16 F.4th 170, 184 (6th Cir. 2021) (citations and internal quotation marks omitted). Under these principles, RLUIPA is not the correct vehicle for Plaintiff to contest an action or policy because it is "ineffective"; because it "creates conditions favorable to abuse"; because it perpetuates a certain "custom or culture"; because it "creates constant tension"; because it "has resulted in hundreds of actual complaints, grievances and many incidences of violence"; because it "diminish[es] mainstream Islam"; because it results in "disparate treatment"; because it is "discriminatory"; or

because it "prejudice[s]" him.  2016 Action, No. 2:16-cv-1020, Doc. 30 at ¶¶ 54–55; (Doc. 71-1 at 10; Doc. 73 at 5–9; Doc. 76 at 5).  Yet these are Plaintiff's reasons for why he should be granted summary judgment on his RLUIPA claim.  Despite his hundreds of pages of filings, the Undersigned can count on one hand the number of times he couches his arguments in terms of "substantial burden."

Plus, even if the Undersigned were to look past every single one of these fatal defects, Plaintiff still has not met his obligation to show that an individual government actor is substantially burdening his religious exercise at GCI.

First, to the extent Plaintiff claims his religious exercise is substantially burdened because he is being "denied" Jumah prayer services or Taleen classes at GCI, the record says otherwise. Plaintiff acknowledges that he attends Jumah prayer services and Taleem instruction at GCI.  (Doc. 76 at 8).  During the 47 weeks between January 3, 2025, and November 28, 2025, Imam Allooh conducted GCI's Jumah services 47 times.  (Doc. 75-1 at 2 (also stating Imam Allooh regularly travels to GCI after sundown to spend an hour or two conducting Taleem classes)).  Even if Imam Allooh—or another service leader—missed isolated services, that would not be enough for Plaintiff to demonstrate that his religious exercise is substantially burdened.  *See Greenberg v. Hill*, No. CIV.A. 2:07-CV-1076, 2009 WL 890521, at \*6 (S.D. Ohio Mar. 31, 2009) ("[I]solated or sporadic government action or omission is *de minimis* and does not constitute a "substantial burden."); *cf. Stepler v. Warden, Hocking Corr. Facility*, No. 2:12-CV-1209, 2013 WL 3147953 (S.D. Ohio June 18, 2013) ("'An isolated denial, such as having to miss a single religious service, does not constitute a substantial burden on a prisoner's right to practice his religion.'" (quoting *Thompson v. Quarterman*, No. V01–01, 2007 WL 2900564, at \*2 (S.D. Tex. Sept. 30, 2007)); *Hampton v. Vantiel*, No. 3:24-CV-01480, 2026 WL 382904, at \*6 (M.D. Tenn. Feb. 11, 2026)

21

(noting the denial of a religious practice on a single occasion does not constitute a substantial burden); *Bynum v. Poole*, No. 1:15CV960, 2017 WL 3578698, at *4 (M.D.N.C. Aug. 17, 2017) (finding an isolated incident of a cancelled Jumah service did not constitute a substantial burden).

Second, to the extent Plaintiff claims that Jumah services at GCI are not proper, the Undersigned has only a vague idea what he means. Time and time again, Plaintiff nebulously refers to Jumah services that are not "valid" or do not include "mandatory rites and rituals of mainstream practice." (*See, e.g.*, Doc. 71-1 at 16; Doc. 73 at 3). Plaintiff makes no effort in his summary judgment briefing to explain what "mandatory rites and rituals of mainstream practice" means. Instead, he waxes poetic about the ways he feels personally victimized by ODRC's policies as applied to Christian inmates. (*See, e.g.,* Doc. 71-1 at 9–12). Even looking through Plaintiff's exhibits, all the Undersigned can cobble together is that Plaintiff wants "Kutba al-Hijr" recited in Arabic during each Jumah service and "sitting" between the two portions of the service. (*See, e.g.*, Doc. 71-1 at 23–24; Doc. 71-2 at 22, 48). Nowhere does Plaintiff specifically state or support that these rituals are not happening at GCI. (*See, e.g.*, 71-1 at 22–23 (vaguely mentioning these "requirements" but only identifying past religious contractors); *cf.* Doc. 75-1 at 2 (Imam Allooh's testimony that he sits in between his two speeches during Jumah services)).

Third, to the extent that Plaintiff claims that his religious exercise at GCI is substantially burdened because of the implementation of certain standards of worship, he has not tied that action to the involvement of any Defendant. *See, e.g.*, *Yaacov v. Mohr*, No. 22-3294, 2022 U.S. App. LEXIS 27060, at *4 (6th Cir. Sep. 27, 2022) (noting that to establish liability under RLUIPA, a plaintiff must establish personal involvement). More specifically, Plaintiff asserts that "Defendants have established the [WD Muhammad] style of worship as a standard forcing [Plaintiff] to abandon his mainstream Sunni practice on hundreds of occasions by denying him

22

Jumah either because it was not held or [because it] did not include mandatory rights and rituals." (Doc. 73 at 4). Religious Services Administrator Dr. Mike Davis is the only relevant Defendant against whom Plaintiff appears to assert this type of continuing "policy harm[]" (*see, e.g.*, Doc. 73 at 2). Overlooking the fact that Plaintiff never explains what WD Muhammad-style of worship entails, he has not supported the notion that Defendant Davis—or any other relevant Defendant— "established" an Islamic worship style at GCI. Even Plaintiff's oft-cited accusation that ODRC's "contracting scheme" ensures religious contractors' beliefs do not align with the "mainstream" does not help him here. (*See, e.g.*, Doc 73 at 3). Indeed, Dr. Davis does not select who can apply for a religious services contract nor does he ask applicants which faith denomination they belong to when he considers hiring them. (Doc. 72-2 at 2–3). And, once the contractors are hired, Davis does not personally direct their duties. (*Id.* at 3 (stating the duties are coordinated with the Institutional Chaplain under the direction of the Deputy Warden of Special Services)). In short, actions Dr. Davis took in screening or hiring the Islamic religious contractors do not equate to his personal involvement in deciding when or how those same contractors conduct religious services. The connection is simply too attenuated.

All told, Plaintiff has not carried his burden under RLUIPA to demonstrate a substantial burden to his religious exercise at GCI. But as discussed below, even if he had, it would not matter. Any burden is justified.

### 4. 72-REG-01 and 72-REG-12

Woven throughout his RLUIPA claim—and practically every other part of this case—is Plaintiff's overarching dissatisfaction with ODRC's religion policies. His primary complaint is that all the policies are "ineffective as they apply to Islam" and "create[e] conditions favorable to abuse by contractors, administrators, and staff." 2016 Action, No. 2:16-cv-1020, Doc. 30 at ¶¶ 54–

23

55. And specifically, the "ineffective[ness]" is seen through the policies' failure to differentiate between different denominations of Islam, to define "broadest range of adherents in the faith group," and to define rites and rituals. *Id.* at ¶ 54; (*see also* Doc. 71-1 at 7–10). As best the Undersigned can tell, these examples implicate language in 72-REG-01 and 72-REG-12 only.[3] The former provides that "[s]election of a contract religious provider shall ensure coverage for the largest religious catchments in the facility . . . All contract religious providers shall be advised that they should appeal to the broadest range of adherents in the faith group. They should emphasize the common, fundamental teachings of the faith." (Doc. 72-2 at 14). The latter policy outlines Muslim religious practices at ODRC generally and provides that ODRC has regularly scheduled Jumah congregational prayer and Taleem classes. (Doc. 72-2 at 51–54).

Plaintiff connects every alleged instance of his religious exercise being substantially burdened to these policies. The policies do not provide for a certain number of Islamic service contractors, so Defendants can allocate them in a way that means Plaintiff's institution does not have Jumah service coverage. The polices do not specify the qualifications an Islamic services contractor should have, so Defendants can hire anyone. The policies do not define "broadest range of adherents," so the religious services contractors can espouse any belief. The polices do not differentiate between denominations of Islam, so Jumah services do not have to align with what Plaintiff personally believes. The policies do not define the components of a Jumah service, so the religious services contractors can include or exclude rites and rituals as they so choose. (*See generally* Docs. 71-1, 73, 76). In essence, Plaintiff wants control over every aspect of a religious contractor's job—from hiring to performance. Plaintiff's desire for control implicates the interplay

---

[3] Policies 72-REG-03 through 72-REG-11 and 72-REG-13 discuss services for religions that Plaintiff does not belong to. (Doc. 72-2 at 24–58). And policy 72-REG-02 concerns the manner in which an inmate requests religious affiliation changes and accommodations. (*Id.* at 17–23)

between 72-REL-01 and 72-REL-12.  But Defendants have a compelling interest in maintaining both policies as they stand.

Assuming Plaintiff successfully demonstrated a substantial burden on his religious exercise, which he has not, the "burden shifts to the government to show that the imposition of the burden passes strict scrutiny, 'a tough gauntlet.'"  *Ackerman*, 16 F.4th at 187 (citation omitted). "RLUIPA 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened.'"  *Id.* (citation omitted).  The Court does so by "weighing the government's actual 'interest against the burden on the person bringing a claim.'" *Id.* (citation modified).  Still, prison administrators are owed deference.  Specifically, courts give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Cutter*, 544 U.S. at 723 (citation omitted).

Here, the Undersigned concludes that Defendants meet this standard.  Testimony shows that ODRC does not have "the capacity to provide individualized congregate services for separate religious denominations." (Doc. 72-2 at 4 (declaration of Dr. Davis)).  It does not have the space or staff to "cater to each denomination's individual rites and rituals." (*Id.*).  And it does not have the money to "employ enough Imams to preside over sect-specific Islamic services at each ODRC institution." (*Id.*).  The Undersigned also notes Defendants' assertion that individualized congregate services would create security concerns because of theological hostility between denominations and the possibility of denomination-specific services being used to facilitate non-religious or political agendas. (*Id.* at 5).

25

These justifications for ODRC's generalist religion policies—as they impact hiring and services—are compelling when weighed against Plaintiff's alleged burdens.  Both controlling prison resources and security concerns are compelling government interests in the RLUIPA context.  *See, e.g.*, *Christian Separatist Church Soc'y of Ohio v. Ohio Dep't of Rehab. & Correction*, No. 2:15-CV-2757, 2018 WL 1569744, at *4–5 (S.D. Ohio Mar. 30, 2018) (considering a claim that a plaintiff's religious exercise was substantially burdened because his institution did not allow "separate congregate worship") ("There is no question that ODRC has a compelling interest in safety and security and preventing violence."), *aff'd*, No. 18-3404, 2019 WL 1964307 (6th Cir. Feb. 13, 2019); *Hall v. Martin*, No. 1:11 CV 416, 2012 WL 1536457, at *4 (W.D. Mich. Mar. 15, 2012) (considering a claim that a plaintiff's religious exercise was substantially burdened because his institution did not offer a worship service for his specific religious denomination) ("Controlling prison costs is likewise a compelling governmental interest."), *report and recommendation adopted*, No. 1:11-CV-416, 2012 WL 1537409 (W.D. Mich. May 1, 2012), *aff'd* (Mar. 20, 2013).  And comparatively, when faced with challenges to an institution's denial of "sectarian services in favor of generic congregate services" in the First Amendment context, this Court and the Sixth Circuit have found similar penological justification reasonable.  *El Bey v. Kehr*, No. 1:19-CV-693, 2023 WL 2018769, at *14 (S.D. Ohio Feb. 15, 2023) (collecting cases), *report and recommendation adopted*, No. 1:19-CV-693, 2023 WL 3069750 (S.D. Ohio Apr. 25, 2023), *aff'd*, No. 23-3505, 2024 WL 2977543 (6th Cir. Jan. 29, 2024).

The Undersigned also finds that the policies are the least restrictive means of furthering these compelling interests.  "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without

26

imposing a substantial burden on the exercise of religion by the objecting party." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015) (citation and internal quotations omitted). And "[a]lthough the government 'bears the burden of proof to show its practice is the least-restrictive means, it is under no obligation to dream up alternatives that the plaintiff himself has not proposed.'" *Christian Separatist Church Soc'y of Ohio*, 2018 WL 1569744, at *4 (citation omitted). Here, the Undersigned attends to Dr. Davis's testimony that ODRC simply does not have the resources— space, money, or time—to provide individualized congregate services or to hire denomination-specific contractors. (Doc. 72-2 at 4). Just providing individualized services for denominations of Islam alone would be "overwhelming." (*Id.*). This testimony shows there is little middle ground here in the "least restrictive means" analysis. Either ODRC allows and enforces sectarian services, or it doesn't. Either ODRC hires more denomination-specific contractors, or it doesn't. *Cf. Christian Separatist Church Soc'y of Ohio*, 2018 WL 1569744, at *5 (finding testimony that denying congregate worship is "necessary" sufficient—even though the defendant did not use that term "least restrictive means"—where the choice was "effectively binary").

What's more, Plaintiff's suggestions of less restrictive alternatives are unworkable. Reading Plaintiff's briefing generously, his offered solutions include defining Jumah services in 72-REL-12 according to his personal beliefs, "separating Mainstream Sunni Islam" from other denominations, expanding the number of Islamic religious contractors, and designating an Imam to aid in the screening and hiring of contractors. (*See* Doc. 71-1 at 5–6; Doc. 73 at 3; Doc. 76 at 5). The first three are not truly alternatives. Defining Jumah in a certain way to the exclusion of all others, offering separate Islamic services, and hiring more contractors would inherently lead to the "exact harm[s]" that there is a compelling interest in avoiding. *See Christian Separatist Church Soc'y of Ohio*, 2018 WL 1569744, at *5. Particularly with respect to defining "Jumah" in ODRC

27

policy, Plaintiff ignores the fact that if a contractor conducted Jumah in the way he wants, there would naturally be other followers of Islam who do not hold the same beliefs.  (*See, e.g.*, Doc. 73 at 4 (Plaintiff's statement that certain denominations of Islam do not believe that Plaintiff's preferred Jumah rites and rituals are mandatory)).  Defendants would be right back where they started: trying to "cater to each denomination's individual rites and rituals" to the detriment of their own compelling interests.  (Doc. 72-2 at 4).  What's more, Plaintiff offers no denial that hiring more contractors would impinge upon ODRC's scant resources.  *See also Brown ex rel. Indigenous Inmates at N.D. State Prison v. Schuetzle*, 368 F. Supp. 2d 1009, 1022 (D.N.D. 2005) ("Even when a prisoner's rights are substantially burdened, a prison is not under an affirmative duty to hire a particular clergy person.").  Nor does he support the notion that sectarian services would not implicate prison security.  He simply supplies vague statements that combined services have resulted in violence or threats of violence.  (*See, e.g.*, Doc. 71-1 at 7–8, 17–19; Doc. 73 at 5–6, 37).  Finally, as for Plaintiff's last suggestion, the record shows that Dr. Davis already consults with "members of the local mosque to determine [which of the considered contractors] they recommend, regardless of denomination." (Doc. 72-2 at 3).  So, Plaintiff's offered alternative is already reality.

The conclusion that ODRC's policies are the least restrictive means to further a compelling interest is only bolstered by brief consideration of what Plaintiff's supposed burden actually is: that because religious contractors do not share his beliefs, he cannot engage in religious practice. Nothing in the record convinces the Undersigned that Plaintiff is being prohibited from attending Jumah services, prevented from engaging in individualized prayer during Jumah services, barred from Taleem classes, or forced to modify his behavior in a way that violates his beliefs.  Even more, the record clearly shows that to accommodate differences in practices between religious

28

denominations, ODRC allows inmates unlimited visits with their clergy of record to share their individual religious beliefs. (Doc. 72-2 at 2). There is no indication that this avenue is unavailable to Plaintiff at GCI. *Cf. See Christian Separatist Church Soc'y of Ohio*, 2018 WL 1569744, at *6 (considering accommodations such as individualized prayer, observation of holy days, visits with clergy, and access to religious literature as demonstrative of ODRC's consideration of least restrictive alternatives to furthering a compelling interest); *Hall*, 2012 WL 1536457, at *4 (considering an institution's unrebutted assertion that a plaintiff has "many other avenues and opportunities to practice his faith"). All told, the Undersigned concludes that 72-REL-01 and 72-REL-02 as written and applied in this case constitute the least restrictive means of furthering compelling government interests.

As a final note, the relief Plaintiff ties to his RLUIPA claim also seemingly presents problems for him. In essence, Plaintiff wishes for ODRC to rewrite its policies. (*See e.g.*, Doc. 73 at 3 ("[Plaintiff] is simply asking to ensure the existing Jumah services currently provided are valid for the majority of ODRC's Muslim population through a clarification of the word Jumah within policy. Then, to put measures in place that ensure the contractors chosen are reasonably qualified and willing to perform the rites and rituals[.]"); Doc. 71-1 at 8–9 (same)). But neither ODRC nor the person who approved current versions of the religion policies—A.C. Smith (*see, e.g.*, Doc. 72-2 at 51)—are named in Plaintiff's Amended Complaint. *See* 2016 Action, No. 2:16-cv-1020, Doc. 30 at ¶¶ 8–12. Nor has Plaintiff shown that any named Defendant has the authority to modify the policies in the way that he wants. *Cf. Perry v. Curtis*, No. 1:22-CV-729, 2025 WL 2591774, at *9 (W.D. Mich. Aug. 13, 2025) (granting summary judgment where the named defendants did not have the authority to recognize a new religion), *report and recommendation adopted*, No. 1:22-CV-729, 2025 WL 2484783 (W.D. Mich. Aug. 29, 2025); *Ali*

29

*v. Adamson*, No. 1:21-CV-71, 2023 WL 9382485, at *6 (W.D. Mich. Dec. 12, 2023) (dismissing an RLUIPA claim where the defendants did not have the authority to approve a religious accommodation request), *report and recommendation adopted*, No. 1:21-CV-71, 2024 WL 277517 (W.D. Mich. Jan. 25, 2024), *aff'd in part, appeal dismissed in part*, 132 F.4th 924 (6th Cir. 2025).

Even if the Defendants to this action could rewrite ODRC's policies, Plaintiff does not truly contest the validity of the policies themselves—he just wishes they were more specific. If anything, his claim resembles a "void-for-vagueness" First Amendment challenge, which has questionable applicability to prison regulations and is beyond the scope of the Sixth's Circuit remand. *Miller v. Wilkinson*, No. 2:98-CV-275, 2010 WL 3909119, at *6 (S.D. Ohio Sept. 30, 2010) (collecting cases). At base, Plaintiff wants the Court to order ODRC to expand the religion policies to codify Plaintiff's personal beliefs and to dictate how religious contractors should be selected and distributed. RLUIPA offers him no avenue to that end. Consequently, the Court should not grant Plaintiff the relief that he seeks under RLUIPA.

***

For all these reasons, the Undersigned **RECOMMENDS** that the Court **GRANT** Defendants summary judgment on Plaintiff's RLUIPA claim. The Undersigned further **RECOMMENDS** that the Court **DENY** Plaintiff summary judgment for the same.

### E.    Plaintiff's Amendment Request

In a last-ditch effort to save his claims, Plaintiff asks that the Court grant him leave to file either an amendment or supplement to the operative complaint. (*See, e.g.*, Doc. 71-1 at 18–19). Consistent with his modus operandi, he does not fully describe the amendment, but it seems he would like to add at least one new Defendant and several factual allegations. (*Id.*).

30

While Federal Rule of Civil Procedure 15(a) instructs "that leave to amend shall be freely granted, a party must act with due diligence if it intends to take advantage of the Rule's liberality." *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995) (citation omitted). Simply put, Plaintiff's request comes too little, too late in this ten-year-old lawsuit. *See e.g.*, *Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016) ("Allowing an amendment after discovery is closed and summary judgment motions are 'fully briefed' imposes significant prejudice on defendants.") (collecting cases). Plaintiff does not get unlimited do-overs. To the extent Plaintiff requests leave to amend or supplement his Amended Complaint from the 2016 Action, that request is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion to Strike (Doc. 71) and **STRIKES** his Motion for Summary Judgment (Doc. 70). The Court **GRANTS** him leave to file an amended motion for summary judgment (Doc. 71). That said, the Undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment (Doc. 69) be **GRANTED**, and Plaintiff's Amended Motion for Summary Judgment (Doc. 71-1) be **DENIED**. And to the extent Plaintiff asks for leave to amend the operative complaint, the Court **DENIES** that request.

IT IS SO ORDERED.

Date:  March 12, 2026                                    /s/ Kimberly A. Jolson
                                                         KIMBERLY A. JOLSON
                                                         UNITED STATES MAGISTRATE JUDGE

31

**Procedure on Objections**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo* and operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

32